**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Ned GRUBB, Defendant–
Appellant.**

No. 92–5536.

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1993.

Decided Nov. 19, 1993.

Rebecca Ann Baitty, Lutz, Webb, Bobo & Baitty, P.A., Sarasota, FL (argued), for defendant-appellant.

Paul Arthur Billups, Asst. U.S. Atty., Huntington, WV, argued (Michael W. Carey, U.S. Atty., on brief), for plaintiff-appellee.

**430**

Before WIDENER, Circuit Judge, MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation, and CLARKE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

WIDENER, Circuit Judge:

The defendant, James Ned Grubb, appeals from a jury verdict of guilty on the following seven counts of an eight-count indictment: aiding and abetting the payment of a bribe in violation of 18 U.S.C. § 2 and § 666(a)(2); two counts of aiding and abetting mail fraud in violation of 18 U.S.C. § 2 and § 1341; conspiracy to commit fraud in violation of 18 U.S.C. § 371; tampering with a witness in violation of 18 U.S.C. § 1512; obstruction of justice in violation of 18 U.S.C. § 1503; and operating his judicial office as a racketeering enterprise in violation of 18 U.S.C. § 1962(c). The jury found Grubb not guilty of one count of extortion pursuant to 18 U.S.C. § 1951. Grubb challenges the admission of certain evidence; the sufficiency of the evidence to convict him on the bribery, mail fraud, conspiracy, obstruction of justice, and RICO counts; and his 65–month sentence. We affirm.

At the time of his arrest, defendant James Ned Grubb was an elected circuit judge of the Seventh Judicial Circuit of West Virginia, located in Logan County. Previously, Grubb was Logan County assistant prosecutor, elected member of the County Board of Education, and a West Virginia State Senator. While a judge in 1988, Grubb supported Oval Adams in his primary election bid for Logan County Sheriff. In January of 1988, Grubb personally gave Adams $3,000 in cash for his campaign. On April 22, 1988, Grubb addressed a political rally in Chapmanville, West Virginia, in which he strongly supported Oval Adams for Sheriff (Chapmanville speech).[1] Also, near the same time in 1988, Earl Tomblin, a friend of Grubb's and a former Sheriff of Logan County, met with Grubb in his judicial chambers and discussed Oval Adams's race for county sheriff. Grubb asked Tomblin if he was going to help Adams, and Tomblin offered to give Adams $10,000 for his campaign if Adams would give him two years of part-time work if elected sheriff. Tomblin told Grubb that he needed the two years of work for his social security and state pension benefits. Grubb agreed to relay this offer to Adams and "see what he could do." Subsequently, Grubb met with Adams, and told him of Tomblin's conditional offer. Grubb told Adams to "think about it." Later, Grubb asked Adams if he had met with Tomblin and Adams answered that he had. On May 2, 1988, Tomblin gave Adams $10,000, with the understanding that Adams would hire Tomblin if elected or pay the money back if not elected. Adams won the primary and general elections and in July of 1989, Tomblin asked Grubb to "remind Oval [Adams] about my job." Grubb did so. Adams then hired Tomblin to be a part-time investigator for the Sheriff's office, beginning in July of 1989. Tomblin received a salary,

---

1. In the Chapmanville speech, Grubb stated, in part:

> Now, Oval Adams was raised here. He has roots here. His family's here. Mine is, too. We're not going to come down here and bother you people. If he gets in to office, no matter how much applause you give him tonight, he won't have helicopters and laws and policemen come in on you when there's no need to. If you all here tonight are like this judge is or like Oval Adams is going to be, we don't want justice, we want mercy, mercy, mercy.

> . . . . .

> If you all believe in me, as I believe you do, because there's people in this room . . . most of you here in this room, I've touched your lives, one way or another . . . I have never closed my door on any of you. Lonnie, Barry, and Ron Dingess and Earl Tomblin . . . All of you can

say I've been there when you needed me. I've never turned my back on you.

> But if you believe in me, which I believe you do, then believe in this ticket. I believe so strong in this ticket. If there's a daddy to this ticket, it's got to be me. It's getting close, but I don't want to lose it. And I want you all here tonight to make a commitment not only to me, I'm not running. Make a commitment to yourself for a better Logan County. Make a commitment to yourselves that you must have and will have better candidates to serve you and better officeholders to serve you.

> . . . . .

> I'm not ashamed of my ticket. I'm for these gentlemen, and I want you to be. I want you to be able to come to me after this election and say, "Judge, I did all I could." If you do, I'll still have mercy. If you don't, it's justice.

along with social security, retirement, and other benefits, but he performed little work for the Sheriff's office, he did not "perform functions for the sheriff's office on a regular basis." For two years, the county clerk mailed to the West Virginia Public Employees Retirement System both the county's and Tomblin's share of pension contributions.

In August 1991, as part of a plea bargain to a charge of conspiracy to transport stolen coal across state lines, Oval Adams agreed with the FBI to meet with Grubb and tape their conversations. On September 19, 1991, Adams met with Grubb in his chambers, communicated that the FBI was investigating him and a federal grand jury had subpoenaed him, and asked Grubb for advice. During this conversation and another one on September 25, 1991, Grubb suggested several approaches Adams could take in regard to the federal investigation and his upcoming grand jury appearance, including lying about or mischaracterizing Adams's deal with Tomblin, and even telling the truth in exchange for immunity. On October 8, 1991, special agents of the FBI questioned Grubb and he denied knowledge of any illegal campaign contributions in 1988 and denied personal involvement in getting Tomblin employment with the Sheriff's Office. Further, Grubb proffered legitimate reasons why Tomblin did not pay for the job, including the fact that Adams didn't need any money for his campaign and Adams was a friend of Tomblin's son.

Grubb's involvement in the Tomblin/Adams employment in return for a campaign contribution and the subsequent mailing of pension contributions formed the basis of Count One, aiding and abetting the payment of a bribe in violation of 18 U.S.C. § 2 and § 666(a)(2); Count Two, aiding and abetting mail fraud in violation of 18 U.S.C. § 2 and § 1341; and Count Three, conspiracy to commit bribery and mail fraud in violation of 18 U.S.C. § 371. Grubb's advice to Adams

regarding Adams's upcoming grand jury appearance is the basis of Count Four, witness tampering, in violation of 18 U.S.C. § 1512. Grubb's statements to the FBI agent form the basis of Count Five, obstruction of justice in violation of 18 U.S.C. § 1503.

Grubb did not have to run for re-election until 1992. However, he was a powerful figure in local politics and local elections and supported his own slate of candidates for local elections in 1988 and 1990. In early 1990, James Burgess, a candidate for state senator in a district that included Logan County, sought Grubb's political support. Burgess testified that he sought out help from Grubb because "I needed some help in Logan County, and I figured he, being a circuit judge, he would have a lot of political clout and he would be very essential to my campaign." Burgess met with Grubb at various places, including Grubb's chambers. In April of 1990, Grubb called Burgess and other candidates to a meeting at Grubb's house to discuss financing the upcoming election campaign. At that meeting, Grubb told Burgess that his contribution to the campaign expenses of the slate of candidates would be $10,000. Burgess agreed because "I knew Logan County politics you had to get on the slate if you expect to win." Several days later, Burgess gave Grubb $10,000 in cash. When Burgess filed the campaign finance report required by West Virginia law, he omitted reporting this illegal cash payment to Grubb, as well as Grubb's expenditure of those funds in behalf of Burgess and the slate.[2] Burgess mailed this report to the West Virginia Secretary of State. Burgess testified at trial that the reason he did not report the $10,000 cash given to Grubb was because

> I didn't know what was going to happen. I think it was very important at that point in time, I was dealing with a judge in Logan County, and I thought it couldn't be too bad, so I wasn't worried about any legal

---

2. Under West Virginia law, any candidate or person supporting a candidate must keep detailed accounts of monies received and spent and must file a report of the receipts and expenditures with the West Virginia Secretary of State. W.Va.Code §§ 3–8–5, 5(a), 5(b), and 7. Furthermore, W.Va.Code §§ 3–8–5d and 3–8–12(f) limit

individual contributions to $50 cash and $1,000 per candidate. W.Va.Code § 3–8–11 makes it illegal for any person to solicit money from a candidate in exchange for support unless that person is a duly appointed and designated member of a political party committee.

proceedings or any indictment. So I didn't list it because I didn't know what he was going to do.

So Burgess testified that he did not worry about any legal proceedings or an indictment because he was "dealing with a judge." He assumed that Grubb would use the $10,000 cash to pay for various campaign expenditures for Burgess and other candidates of Grubb's Logan County slate. The use of the mail to deliver the false campaign report in furtherance of Grubb's and Burgess's scheme to defraud,[3] resulted in Count Seven, aiding and abetting and mail fraud in violation of 18 U.S.C. § 1341 and § 2.

At trial, the jury acquitted Grubb of Count Six, extortion in violation of 18 U.S.C. § 1951. That count charged Grubb, along with his ex-wife Linda, of using Grubb's judicial position to extort $4,000 from an attorney who had a medical malpractice case pending before Grubb's court.

Count Eight of the indictment, a RICO charge pursuant to 18 U.S.C. § 1962(c), alleged that Grubb used the office of Judge of the Seventh Judicial Circuit of West Virginia as a RICO enterprise and conducted the affairs of that enterprise through a pattern of racketeering activity, i.e. the bribery of Adams (Count One), the mail fraud involving Tomblin's pension payments (Count Two), witness tampering in advising Adams to lie to the grand jury (Count Four), the Burgess mail fraud (Count Seven), and extortion (Count Six). The jury convicted Grubb of the RICO count, and all of the underlying predicate acts, except for extortion.

## I.

◼ The defendant challenges the admission of certain evidence as irrelevant under Fed.R.Evid. 402 and prejudicial under Fed. R.Evid. 403. Specifically, Grubb contests the admission of the following evidence: Grubb's

advising a bankruptcy client to conceal a financial asset during a bankruptcy proceeding and his subsequent license suspension in 1972; the Chapmanville speech; the text of canons 2 and 7 of the Code of Judicial Ethics; and the cross-examination of Grubb regarding his marital status with Linda Grubb.

Grubb claims that the evidence regarding his prior advice to his client not to tell the whole truth to the bankruptcy court, as well as his subsequent disbarment, was irrelevant, prejudicial, improperly used to show conformity under Fed.R.Evid. 404(b), and was not admissible under 404 due to its remoteness in time. The district court considered the prejudicial effect of the evidence and decided that its probative value outweighed any unfair prejudice that might result. The advice Grubb gave to Adams was so remarkably similar to that Grubb had given to the earlier bankrupt that the district court admitted the evidence to show whether Grubb "respects the truth as he defines it." This is essentially a question of relevance, and we are of opinion its admission was not an abuse of discretion. See also *United States v. Jackson*, 882 F.2d 1444, 1448 (9th Cir.1989) (deferring to district court's admission of evidence of defendant's disbarment 14 years previously for misappropriation of client's funds as particularly probative of his truthfulness).

◼ We agree with the government's position that the Chapmanville speech was relevant to the bribery, mail fraud, conspiracy, and RICO counts because it showed Grubb's support of Adams and his motivation for engaging in those criminal acts, as well as Grubb's general intent to use his judicial office as a racketeering enterprise.

◼ Grubb objects to the government's use of canons 2 and 7 of the West Virginia Code of Judicial Ethics (1991)[4] in his cross-

---

3. The indictment details the scheme to defraud as one to "obtain money and property by means of false and fraudulent pretenses"; "to illegally fund the election campaign of the slate of candidates supported by" Grubb; and to "defraud the citizens of Logan and Boone Counties in their rights to ... [a] fair and honest election [and] ... [t]he honest services of" Grubb as circuit judge and Burgess as state senator.

4. Canon 2 provides that a judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidences and integrity in the impartiality of the judiciary. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others nor should he convey

examination, claiming that such evidence was an improper attempt to prove that Grubb violated the canons by making the Chapmanville speech, and that a violation of the canons was not relevant to the charged crimes. The government argues that the canons are relevant because the charges involve using judicial office for political and personal gain. The district court permitted use of the canons during cross-examination of the defendant on the grounds that they were relevant to show "intent, absence of mistake, and things of that nature." We are of opinion that there was no abuse of discretion in allowing cross-examination of the defendant as to his knowledge of the canons.[5] Furthermore, in an abundance of caution, the use of the canons was made subject to a limiting instruction to the jury.[6]

■ Linda Grubb, testifying as to Count Six, the extortion charge, stated that her husband had no knowledge of the $4,000 that she received from a lawyer for working on a case that was pending on her husband's docket. She also stated that she did not include the $4,000 on her income tax return and that she and her husband filed separate income tax returns. The government later cross-examined Grubb regarding his marital status with Linda Grubb.[7] The district court admitted evidence of the divorce as relevant

to show why Linda Grubb filed her tax return, already in evidence, as a single person. Further, the district court admitted evidence that the purpose of the divorce was to avoid garnishment of Linda Grubb's wages to show that the defendants discussed finances and this was relevant to whether Grubb knew of the $4,000 payment to his wife. Again, we discern no abuse of discretion in admitting this evidence.

## II.

The remainder of Grubb's issues on appeal, other than sentencing issues, relate to the sufficiency of the evidence or statutory interpretation. In reviewing the sufficiency of the evidence supporting a criminal conviction, the verdict "... must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Statutory interpretation review is *de novo. United States v. Hall,* 972 F.2d 67, 69 (4th Cir.1992).

## III.

■ With respect to his conviction under Count One, aiding and abetting the payment of a bribe in violation of 18 U.S.C. § 2

---

or permit others to convey the impression that they are in a special position to influence him.

Canon 7 provides that a judge who is not a candidate for election or reelection should not:
 (a) act as a leader or hold any office in a political organization;
 (b) make speeches for a political organization or candidate or publicly endorse a candidate for public office except as permitted in [another section].

5. In *United States v. Morlang,* 531 F.2d 183, 191–2 and n. 16 (4th Cir.1975), we held that instructing the jury as to the standards of conduct required of HUD employees, to show the standard required of the director of a HUD program, is admissible so long as the standards "prescribe duties and modes of conduct as opposed to broad ethical and moral precepts" and specifically approved of use of the standard that prescribes "using public office for private gain." The canons at issue in this case are as specific as those approved in *Morlang.*

6. The district court instructed the jury as follows:

... [T]here will be reference now to matters contained in a judicial code or canon of ethics ... it applies to Judge Grubb in his capacity as a judge. Also, keep in mind that the fact that the matters of standards or rules of conduct for the judiciary and either adherence to those standards or violation of those standards do not constitute crimes or other wrongs and keep that in mind.
 This is merely a set of standards that a judge has to observe under certain circumstances and the issue of his observance or non-observance of those statutes or those canons you may take into consideration on the matter of intent as it relates to the charged crimes, absence of mistake, motive, things of that nature
· . . . .

7. Grubb testified that he and Linda Grubb were divorced from June 1986 until April of 1991 so that Grubb's problems with the Internal Revenue Service would not affect her wages. However, they continued to live together and hold themselves out to the public as married during that period of divorce.

and § 666(a)(2),[8] Grubb contends that the government did not prove the jurisdictional predicate of section 666(b) [9] and that section 666(a)(2) does not apply to the granting of employment in exchange for political support or apply to payments made to candidates who are not government agents at the time of the bribe. Finding no merit to these contentions, we affirm. We are of opinion that the government's proof that Logan County received over $10,000 in federal funds between July 1, 1988 and June 30, 1989, and again between July 1, 1989 and July 1, 1990, sufficiently proves the jurisdictional predicate. Acts making up the bribery offense were performed at least until August, 1989, when Tomblin was given the job he paid for. Those acts occurred within the two 12–month periods in which the county received in excess of $10,000 in federal funds, which sufficiently proved the jurisdictional predicate.

▮ The defendant argues that section 666(a)(2) does not apply to the granting of employment in exchange for political contributions and cites *United States v. Cicco*, 938 F.2d 441 (3d Cir.1991), which concluded that section 666 was ambiguous as to whether contribution of previously existing party loyalty in exchange for retaining government employment is bribery within the meaning of

the statute and, therefore, resorted to legislative intent to hold that Congress did not intend such coverage under section 666.[10] However, Congress enacted section 666 to extend the reach of 18 U.S.C. § 201, which covers bribing federal public officials, to include bribery of "an official, employee, or agent of a State or local government agency." S.Rep. No. 225 at 369, 1984 U.S.C.C.A.N. (98 Stat.) 3510, 3511. Tomblin's $10,000 bribe of Adams, and Grubb's participation in that bribery, come squarely within the literal meaning of section 666(a)(2) and we see no clearly expressed legislative intent to the contrary. See *United States v. Sheek*, 990 F.2d 150, 152–53 (4th Cir.1993) (absent ambiguity or an unambiguously expressed legislative intent to the contrary, the statute must be given its literal meaning). Furthermore, defendant's argument, that the section 666(c) exemption for bona fide wages applies to this situation, lacks merit. Certainly Tomblin's wages were not "bona fide" and "in the usual course of business" within the meaning of the statutory exception of § 666(c).

## IV.

▮ Grubb appeals both his mail fraud convictions, pursuant to 18 U.S.C. § 2 and § 1341.[11] The defendant claims that the

---

8. 18 U.S.C. § 666(a)(2) penalizes any person who:

 corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

9. 18 U.S.C. § 666(b) requires, as a predicate for jurisdiction, that the governmental unit involved "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contact, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(d)(4) defines "in any one year period" as "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense." In short, the proof must be of any one year period that includes the date of the crime.

10. The *Cicco* court acknowledged that "a solicitation of specific election day services with municipal employment as the *quid pro quo*, might come within the literal language of § 666." The court reasoned that, since the charged conduct was illegal for federally funded jobs under 18 U.S.C. § 601 (covering deprivation of employment to enforce political contributions), and Congress did not mention § 601 when enacting § 666, then Congress did not intend § 666 to cover conduct that § 601 covers. *Cicco*, 938 F.2d at 444.

11. 18 U.S.C. § 1341 provides in relevant part:

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purpose of executing such scheme or artifice ... places in any post office or authorized depository for mail ... any matter or thing whatever to be sent or delivered by the Postal Service ... or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

monthly mailing of the employee retirement premiums to the West Virginia Public Employee Retirement System were in compliance with the County Commission's legal duty and, therefore, these mailings are not sufficiently related to the fraudulent scheme to support the mail fraud conviction. Grubb relies on *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), but his reliance is misplaced. The Court reversed the mail fraud convictions in *Parr* because, in the absence of allegations in the indictment and proof at trial that the taxes assessed and collected were in some way unlawful, legally required mailings of those assessments and collections are not steps in a scheme to defraud, even if those that caused the mailings intended to steal some of the moneys after receipt. *Parr*, 363 U.S. at 391–92, 80 S.Ct. at 1183–84. However, unlike the tax assessments and collections in *Parr*, the retirement contributions in this case were grounded wholly on an illegal scheme to defraud. Thus, the mailings of the contributions were "incident to an essential part of the scheme" and could "reasonably [have] be[en] foreseen, even though not actually intended. . . ." *Pereira v. United States*, 347 U.S. 1, 8, 9, 74 S.Ct. 358, 362, 363, 98 L.Ed. 435 (1954). Similarly, there is no merit to Grubb's contention that the mailing of the Burgess campaign finance disclosure report was unforeseeable to him. Viewing the evidence in the light most favorable to the government, as a former candidate himself, Grubb knew that the report would be mailed, as required by law, and that the $10,000 that Burgess gave to Grubb would not be reported because it was illegal under West Virginia law.[12]

■ Grubb challenges his mail fraud conviction on Count Two because the fraud underlying that conviction involved, in part, depriving the citizens of Logan County of the honest services of their public officials. After the Supreme Court held in *McNally v.*

*United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), that such schemes could not be prosecuted under section 1341, Congress expanded the definition of fraud to include them, effective November 18, 1988.[13] Grubb contends that the mail fraud conviction falls under the *McNally* exclusion since the bribe occurred before November 18, 1988. There is no arguable merit to this contention, however, for the district court charged the jury, without objection, that in order to lie under Count Two, the scheme had to be "to obtain money or property from persons or organizations so deceived—that's as charged in count number two—or to deprive the citizens of the honest services of their public officials or their candidates for public office as charged in another count." The government also argues that the scheme continued beyond the payment of the bribe in May of 1988 and included the illegal appointment of Tomblin to the Sheriff's Department, as well as the continuing pension contributions, therefore a part of the underlying fraud occurred well after the effective date of the amended section of 1346. While the argument is logical and may even seem persuasive, we do not reach the question because the district court limited the jury inquiry to "money or property" under Count Two.

## V.

■ Grubb asserts that his conviction on Count Five, for obstruction of justice in violation of 18 U.S.C. § 1503[14] cannot stand because mere false statements to an FBI agent do not constitute obstruction of justice, as a matter of law, and such false statements are prohibited by other federal laws. The government contends that Grubb's conduct falls literally within the scope of section 1503 and argues that the evidence showed that Grubb's lying to the FBI agent was an at-

---

**12.** Grubb testified that he knew that the $10,000 campaign contribution that he received from Burgess was illegal.

**13.** 18 U.S.C. § 1346, as amended, provides:
For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

**14.** The part of 18 U.S.C. § 1503 relevant to this prosecution, provides:

Whoever corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

tempt to impede the grand jury investigation being conducted through this FBI agent, by leading the agent astray.[15]

The defendant relies on *United States v. Essex*, 407 F.2d 214 (6th Cir.1969), which held that a defendant's act of filing a false affidavit in federal district court in support of Teamsters president Jimmy Hoffa's motion for a new trial, alleging that she had sexual intercourse with several of Hoffa's petit jurors while they were sequestered for deliberations, did not support a juvenile conviction for obstruction of justice under section 1503. Characterizing section 1503 as prohibiting "contemptuous conduct away from court," the court based its decision on the holding of *In re Michael*, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945), that perjury alone does not constitute obstruction of justice. *Essex*, 407 F.2d at 217.

■ A discussion of the facts and holding of *In re Michael* is instructive in deciding whether perjury or false statements can ever be a basis for an obstruction of justice charge.[16] In *In re Michael*, a federal grand jury investigating frauds against the United States subpoenaed a company's trustee in bankruptcy to testify concerning the administration of the bankruptcy reorganization. The trustee was questioned regarding payments made from the bankrupt's assets and he gave answers which the government felt were false. The government brought the trustee before the district court to show cause why he should not be held in contempt of court for obstructing the grand jury investigation, pursuant to § 268 of the Judicial Code.[17] The district court concluded that the trustee's answers were false and cited the trustee for contempt of court. The issue which the Court emphasized was "whether it was proper for the District Court to make its finding on that issue [falsity of testimony] the crucial element in determining its power to try and convict petitioner for contempt." *In re Michael*, 326 U.S. at 227, 66 S.Ct. at 79. Noting that the statute on its face gives "the courts ample power to protect the administration of justice against immediate interruption of its business" that power is limited to the "least possible power adequate to the end proposed" in order to retain the procedural safeguards of the Bill of Rights.[18] *In re Michael*, 326 U.S. at 227, 66 S.Ct. at 79 (emphasis added). While the Court noted that all perjury tends to "defeat the sole ultimate objective of a trial" in that "it may produce a judgment not resting on truth," the Court noted that such false testimony "need not necessarily, however, obstruct or halt the judicial process", especially in view of the fact it is the function of a trial to "sift the truth from a mass of contradictory evi-

**15.** Count Five of the indictment stated that there was a sitting Grand Jury investigating Grubb, Tomblin, and Adams and that the Grand Jury was assisted in this investigation by Special Agents of the FBI and federal prosecutors. The indictment further alleges that Grubb became aware of the federal investigation and that on or about October 8, 1991 (the date of Grubb's meeting with FBI agents) he did corruptly endeavor to influence, obstruct and impede the Grand Jury Investigation, and thus the due administration of justice, by making false and misleading statements to the FBI concerning his involvement in the Tomblin/Adams affair or any illegal cash campaign contributions in 1988.

**16.** For a summary of a number of the relevant circuit cases concerning false testimony as obstruction of justice under section 1503, see Michael J. Kaplan, Annotation, *Construction and Application of 18 USCS § 1503 Making It a Federal Offense to Endeavor To Influence, Intimidate, Impede, or Injure Witness, Juror, or Officer in Federal Court, or To Obstruct The Due Administration of Justice*, 20 A.L.R.Fed. 731, § 17 (1974 & Supp.1992).

**17.** § 268, now codified as 18 U.S.C. § 401, as well as § 1503, both derived from the Act of 1831, 4 Stat. 487, provided in part that the "power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, ... and the disobedience or resistance by any ... witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts." *In re Michael*, 326 U.S. at 225, n. 1, 227, 66 S.Ct. at 78, n. 1, 79. See also *United States v. Williams*, 874 F.2d 968, 978 (5th Cir.1989) for a discussion of the origins of the contempt and obstruction statute, Act of March 2, 1831.

**18.** In framing the issue as a court's power under the contempt statute, the Court specifically mentioned that the trustee could have been indicted for perjury in which he would have received a jury trial and a jury determination of whether he had lied. *In re Michael*, 326 U.S. at 226–227, 66 S.Ct. at 79.

dence which requires both truthful and false witnesses." *In re Michael,* 326 U.S. at 227, 66 S.Ct. at 79. Therefore, the Court held that, to punish for contempt, the element of "obstruction of the Court in the performance of its duty" must clearly be shown. The Court reversed the conviction because "[h]ere there was, at best, no element except perjury 'clearly shown.'" *In re Michael,* 326 U.S. at 228, 66 S.Ct. at 80.

*In re Michael* relies heavily on *Ex Parte Hudgings,* 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919), in which a district court punished a witness for contempt because it was convinced that the witness, called by the prosecution for the purpose of establishing the authenticity of certain handwriting of people the witness knew, was testifying falsely when he said he could not remember ever having seen the people write anything in his presence. The court held that this punishment for contempt exceeded the court's contempt power since the "punishment was imposed for the supposed perjury alone without reference to any circumstance or condition giving to it an obstructive effect." *Ex Parte Hudgings,* 249 U.S. at 384, 39 S.Ct. at 340.

■■■■ The result of *In re Michael* and *Ex Parte Hudgings* is that an obstruction of justice prosecution cannot rest solely on the allegation or proof of perjury; rather, what also must additionally be proven is that the false statements given, in some way, either obstructed or were intended to obstruct[19] the due administration of justice.[20] What this amounts to, simply, is a rule that the government must allege in the indictment and prove at trial all the elements of its case. In the instant case, the elements of obstruction of justice, pursuant to the omnibus clause of section 1503, are (1) a pending judicial proceeding; (2) the defendant must have knowledge or notice of the pending proceeding; and (3) the defendant must have acted corruptly, that is with the intent to influence, obstruct, or impede that proceeding in its due administration of justice.[21] See *United States v. Williams,* 874 F.2d 968 (5th Cir.1989); *United States v. Barfield,* 999 F.2d 1520 (11th Cir.1993).

■■■■ Grubb's tape recorded conversations of September 19 and 25, 1991 with Oval Adams indicate that Grubb was well aware of the existence of the grand jury investigation when interviewed by the FBI on October 8, 1991. Indeed, this is not contested. Earl Tomblin's testimony established that Grubb was aware of and participated in the $10,000 arrangement that Tomblin made with Adams, yet Grubb told the FBI agent that he was not involved in any way with Tomblin's getting the job nor was there money in-

19. The operative wording of the statute is "corruptly endeavor." Such an endeavor need not be successful. *United States v. Russell,* 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921) (holding that a defense attorney's questioning the wife of a potential petit juror as to whether her husband favored an acquittal of the defendant and asking her to ask him, constituted a sufficient "endeavor" to corrupt a juror under the statute; "the section, however, is not directed at success in corrupting a juror but at the 'endeavor' to do so").

20. The Circuits disagree whether perjured or false testimony can form a basis for an obstruction of justice charge under § 1503. The Sixth Circuit in *Essex, supra,* determined that false testimony is not, per se, obstruction of justice. The Ninth Circuit, in the case of *United States v. Aguilar,* 994 F.2d 609, 637 (9th Cir.), factually similar to the case at hand, concluded that false statements to the FBI did not constitute obstruction of justice because FBI investigations are not judicial proceedings, lying to a potential grand jury witness does not imply a corrupt influence or persuasion of that witness, evidence was lacking that the FBI was acting on behalf of the grand jury, and such false testimony must be prosecuted under 18 U.S.C. § 1001, not § 1503), *reh'g en banc granted* (1993). *United States v. Wood,* 958 F.2d 963 (10th Cir.1992), is in accord with our holding. That case reversed the dismissal of an indictment which had alleged that a false statement was given to FBI agents in an endeavor to impede the administration of justice by preventing a grand jury, for which the FBI agents were working, from "learning the true facts and purpose concerning Paul D. Wood's conveyance of … [an] automobile." On remand, the district court again dismissed the indictment, and in *United States v. Wood,* 6 F.3d 692 (10th Cir.1993), the court affirmed the dismissal but did so not on the ground that a statement to the FBI agents was insufficient, but on the ground that the statements "did not have the natural and probable effect of impeding the due administration of justice." 6 F.3d at 697.

21. In this case, the district court correctly charged the jury on these elements.

**438**

volved. Grubb tried to convince the FBI agent that there were other legitimate reasons why Adams hired Tomblin. The FBI agent testified that if he had not had previous information about the true circumstances surrounding the hiring of Tomblin, Grubb's attempt to supply legitimate reasons "would have been much more significant in my investigation." Furthermore, on October 10, 1991 in a taped conversation, Grubb discussed his conversation with the FBI with Adams:

> Adams: ... What if they get so deep into this thing that they ask me if I took anything from you or Earl, either one, do I tell them the truth?
>
> Grubb: There's nobody knows about me and you for sure, I don't believe.
>
> . . . . .
>
> Adams: ... They know what's going on, Judge.
>
> Grubb: They've got a good suspicion. They don't know. They don't know. Only way they're gonna know is find out from me or you or Earl. They can't find that out from me.

We are of opinion that substantial evidence existed for a jury to find that Grubb's purpose in lying to the FBI about his own involvement in the Tomblin/Adams affair and supplying false reasons why Adams hired Tomblin was in an endeavor to stymie the grand jury investigation. This evidence sufficiently supports the charge that Grubb "corruptly endeavored to influence, obstruct, or impede" the due administration of justice by interrupting the grand jury in its pursuit of information. See *In re Michael*, 326 U.S. at 227, 66 S.Ct. at 79. Grubb's false state-

ments to the FBI agents are not significantly different from influencing a witness before the grand jury to give false testimony. The effect, that of obstructing the Grand Jury investigation, is the same. In *United States v. Kenny*, 973 F.2d 339, 342 (4th Cir.1992), we held that Section 1503 criminalizes the corrupt persuasion of a grand jury witness.[22] We are of opinion that the only difference between this case and *Kenny* is that *Kenny* involved an open overture to a witness to testify falsely to a grand jury, whereas Grubb gave false information in an endeavor to get the FBI agent to give false information to the grand jury, albeit unknowingly. The obstruction of justice conviction under § 1503 is thus affirmed.

## VI.

■■■ Grubb appeals his RICO conviction, under 18 U.S.C. § 1962(c)[23] contending that none of the predicate offenses to the RICO charge involve conduct related to the affairs of the judicial office, the RICO enterprise defined in the indictment. Grubb argues that his political power, which facilitated the predicate offenses, was a result of his long history of political activity, rather than a result of his judicial office. The issue to be decided, therefore, is whether the predicate offenses involved conduct of affairs of the office of the judge, within the meaning of 18 U.S.C. § 1962(c). Here, we have a properly defined RICO enterprise, i.e. the Office of Judge of the 7th Judicial Circuit. See *United States v. Hunt*, 749 F.2d 1078, 1088 (4th Cir.1984) (judgeship can be an enterprise for RICO purposes), *cert. denied, Hunt v. United States*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985). We also have a defen-

---

22. This is true, even though the same conduct is chargeable under 18 U.S.C. § 1512, the witness tampering statute. *Kenny*, 973 F.2d at 342.

23. 18 U.S.C.A. § 1962(c) provides that:
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 In relevant part, 18 U.S.C. § 1961(1) defines racketeering activity to include

... any act ... involving ... bribery, ... which is chargeable under State law and punishable by imprisonment for more than one year or any act which is indictable under any of the following provisions of title 18 U.S.C. ... section 1341 (relating to mail fraud) ... section 1503 (relating to obstruction of justice) ... section 1512 (relating to tampering with a witness). ...
 Furthermore, a "pattern of racketeering activity" requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5).

dant who undeniably is employed by and operates or manages the enterprise within the meaning of *Reves v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (U.S.1993).[24]

█ Our holding in *United States v. Webster,* 639 F.2d 174 (4th Cir.), *cert. denied sub nom. Christian v. United States,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981) (*Webster I*), *modified in part on reh'g,* 669 F.2d 185 (4th Cir.), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982) (*Webster II*), controls this case. In *Webster I,* 639 F.2d at 185, we vacated a RICO conviction, holding that "§ 1962(c) requires more than merely some connection or even a 'substantial nexus' between a lawful enterprise and the prohibited pattern of racketeering." We required in *Webster I* that the affairs of the legitimate enterprise be benefitted, promoted, or advanced by the racketeering activities. *Webster I,* 639 F.2d at 186–186. The RICO indictment in *Webster* charged the defendants with operating a certain 1508 Club enterprise through a pattern of racketeering activity, i.e., the illegal drug activities. We concluded that while the government offered proof that the club's telephone was used to receive and relay drug-related messages and the club once provided a drink to a narcotics customer of the defendant while he waited for drugs, the drug activities were not "designed to further the business of the enterprise charged in the indictment" and a RICO conviction could not be sustained. *Webster I,* 639 F.2d at 185.

We reversed ourselves on this precise point, however, on rehearing in *Webster II,* and we held that

[e]ven if the single provision of refreshment did not constitute "conduct", the regular and repeated acceptance and relay of messages did.

*Webster II,* 669 F.2d at 186. We made it clear in *Webster II* that we rejected any requirement that the racketeering activity benefit the RICO enterprise. Specifically, we saw that such a requirement would be problematic "in cases where the enterprise is governmental in nature, and almost universally not organized for profit." *Webster II,* 669 F.2d at 186, *citing United States v. Welch,* 656 F.2d 1039, 1061 (5th Cir.1981) ("We find no evidence that Congress did not intend section 1962(c) to reach situations in which the power and authority of a governmental entity is utilized to enable those associated with that entity to engage in racketeering"), *cert. denied sub nom. Cashell v. United States,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). Therefore, considering the fact that Grubb physically used his judicial office in much the same manner as the drug-traffickers used the 1508 Club, i.e. the telephones and the physical office itself, not to mention the prestige and power of the office itself, a sufficient nexus between the enterprise and the racketeering activity is established. Although it may not strictly be necessary in order to sustain the conviction, as an additional reason supporting the fact that the affairs of the enterprise were conducted through a pattern of racketeering activities, is the fact that the record shows beyond doubt that the power and prestige of Grubb's office placed him in a position to perform the discrete, corrupt and fraudulent

---

**24.** The defendant relies on *Reves* to support the contention that Grubb did not operate his office through racketeering activity. In *Reves,* the Court held that an accounting firm could not be held civilly liable under RICO to creditors of the accounting firm's client that filed bankruptcy, where the accounting firm had valued the client's gasohol plant in an incorrect way. The Court reasoned that "§ 1962(c) cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." The Court concluded that in order to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs, "one must participate in the operation or management of the enterprise itself," *Reves,* —— U.S. at——, 113 S.Ct. at 1172. In the instant case, there is no doubt that Grubb participated in the operation or management of the enterprise, i.e. the judicial office. The issue in *Reves* is distinguishable from the issue in this case. *Reves* emphasized defining "conduct" and "participate" to determine who could be brought within RICO's ambit and decided that only those who manage or operate an enterprise are covered under RICO. In this case, however, we examine the connection required between the racketeering activity and an enterprise's affairs, i.e. whether Grubb's racketeering activity involved the affairs of his office.

acts of which he was convicted and which make up the RICO predicate offenses.

 Grubb also contends that the evidence in his case failed to establish a pattern of racketeering activity under *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989), which held that a pattern of racketeering activity requires proof that the "racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." (Emphasis in original.) We are of opinion that sufficient evidence was presented so that the jury could reasonably have concluded that Grubb's racketeering predicate acts were related and a threat of continued criminal activity existed. In *Northwestern Bell* the Court held that predicate acts are related if they have

> the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events ... We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates
>
> . . . .

*Northwestern Bell*, 492 U.S. at 240, 109 S.Ct. at 2901. Grubb's predicate acts in the campaign fraud schemes are related in similar purpose and results. The purpose in each case was to elect the candidate supported by Grubb, aided by illegal campaign contributions. The result in each case was election by means of the illegal plan. Tampering

with the witness was ancillary to the Adams election.

> Continuity can be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit ... [or] where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*Northwestern Bell*, 492 U.S. at 242–243, 109 S.Ct. at 2902. Grubb's predicate acts demonstrate a continued effort to use his judicial office to influence elections by illegally raised campaign contributions. We are of opinion that sufficient evidence existed to prove that such activity was likely to continue for as long as Grubb remained in authority in Logan County.

## VII.

 The final issues on appeal involve Grubb's sentencing under the Guidelines. The government contends that the defendant, by failing to object to the sentencing computation, waived appellate review by this court.[25] We agree. Absent plain error, appellate review of a sentence is waived when the defendant fails to object to the sentence calculation in the district court. See *United States v. Davis*, 954 F.2d 182, 187 (4th Cir. 1992). This rule, however, is not inflexible and may be relaxed to prevent plain error in the sentencing "so obvious and substantial

---

25. At the sentencing hearing, defense counsel addressed his sentencing objections as follows:

Counsel: I made several objections to, basically, the factual recitation as contained in the presentence report. Some of [the objections] we were not [able to work out] and I've asked those be footnoted in the report. They have been so footnoted. I would plan to address the Court just immediately before sentencing and I believe I can take up those and point out those areas to the Court·that I'm concerned with. But as the report presently stands, it is acceptable to the defendant.

Court: ... You have objections which, as the government does, which might affect the computation of the guidelines in this case. The Court, from the standpoint of notice and due process to the defendant in this case, ought to

resolve those objections in advance of imposing any sentence in the case. If there are objections extant, I want to resolve them now.

Counsel: I do not believe they go to the computation factors, your Honor.

Court: All right then. I'll treat the defense objections as naught. Now, on the other hand, the government's objections [to grouping all convictions in one group] do go to the computation and do you wish to speak to those before the Court makes its interpretation.

Counsel: No, your Honor. I believe that the matter that's been pointed out by the government is a strict application of the law, and the Court can make the appropriate application and adjustment if the Court deems appropriate.

that failure to notice and correct it would affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Fant*, 974 F.2d 559, 565 (4th Cir.1992). We find no plain error warranting an exception to the waiver doctrine. Along the same line, Grubb's claim of ineffective assistance of counsel is not normally considered on direct appeal. We decline to consider the same and do not express an opinion on that question. *United States v. Grandison*, 783 F.2d 1152, 1156–7 (4th Cir.), *cert. denied*, 479 U.S. 845, 107 S.Ct. 160, 93 L.Ed.2d 99 (1986).

The judgment of conviction and sentence is accordingly

**AFFIRMED.**