64 F.3d 660
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lynn Richardson HARTZ, Defendant-Appellant.
 No. 95-5030.
 United States Court of Appeals, Fourth Circuit.
 Aug. 24, 1995.
 
 ARGUED: Robert Clarke VanDervort, ROBINSON & McELWEE, Charleston, W. VA, for Appellant. Hunter P. Smith, Jr., Asst. U.S. Atty., Charleston, W. VA, for Appellee. ON BRIEF: Rebecca A. Betts, U.S. Atty., Charleston, W. VA, for Appellee.
 OPINION
 Before HAMILTON, MICHAEL and MOTZ, Circuit Judges.
 PER CURIAM:
 
 
 1
 This case involves challenges to the sufficiency of the evidence supporting convictions for mail fraud and obstruction of justice, as well as the sentence imposed for obstruction of justice. We affirm.
 
 I.
 
 2
 On January 19, 1994, Appellant Lynn Richardson Hartz was indicted on six counts of mail fraud in violation of 18 U.S.C. Sec. 1341, and one count of obstruction of justice in violation of 18 U.S.C. Sec. 1503, arising out of her activities as president and director of the Women's Counseling Center (WCC) from 1977 to 1993. In May of 1992, Blue Cross/Blue Shield of West Virginia, Inc.,[1] (Blue Cross) began an undercover investigation of WCC--an independent counseling business in Charleston, West Virginia--regarding its suspicious billing practices. On May 4, 1992, Robert Muth, a Blue Cross investigator posing as a patient seeking counseling named Robert Nicholas, entered WCC and met with Edna Houchins, one of WCC's counselors. Muth returned to WCC on March 12, 1992, and again met with Houchins for a counseling session.
 
 
 3
 Following Muth's two visits to WCC, Blue Cross received an insurance claim form from WCC bearing the signature of Hartz, who was licensed neither as a physician nor a psychologist, but rather was a licensed social worker and counselor. On the claim form for WCC's services to Muth, which provided the basis for the third of the six mail fraud indictments against Hartz,[2] Hartz listed Muth's diagnosis as "generalized anxiety disorder." In addition, because the claim form required Hartz to list a "procedure code" for each service rendered, for the services provided to Muth on May 4, 1992, she listed CPT code 90801 (representing "diagnostic interview") and CPT code 90844 (representing "individual medical psychotherapy by a physician").[3] Hartz used CPT code 90844 alone to describe services rendered on May 6 and May 12, 1992. Muth did not visit WCC on May 6, 1992, and was never informed of Hartz's "generalized anxiety disorder" diagnosis.
 
 
 4
 Muth returned to WCC for a third visit on June 30, 1992, accompanied this time by another Blue Cross employee, Nancy Russo, who had first visited WCC on June 18, 1992. This time, Muth and Russo, posing as husband and wife, Robert and Nancy Nicholas, met with Hartz herself and told Hartz simply that they were experiencing a "conflict" as to when they should have children. Hartz informed Muth and Russo that they had no real psychological problems; nonetheless, Hartz suggested that the couple explore "psychic phenomena and Tarot card readings." When Muth and Russo told Hartz that they had a friend who wanted to lose ten pounds, Hartz revealed that she could successfully treat weight problems with hypnosis and because she could bill such problems as psychiatric ailments, they would be covered by medical insurance.
 
 
 5
 Muth and Russo again met Hartz at WCC for counseling on July 13, 1992. On that date, Muth, Russo, and Hartz did not discuss any mental or emotional problems the couple might have been experiencing; rather, Hartz told Muth and Russo that she could sense the presence of angels in the room. Hartz then proceeded to identify Muth's angels as being named John, Elaina, and White Horse. Hartz also identified Russo's angels as Cherry, Ann, and Amy. Hartz further explained to Muth and Russo that they each had a "spiritual animal." According to Hartz, Muth's spiritual animal was the hawk, while Russo's was the monkey. In addition, Hartz conducted a Tarot card reading during the July 13 counseling session, asking Muth and Russo to select cards from various decks so that Hartz could make predictions. Hartz admitted to Muth and Russo that she preferred this form of therapy over psychotherapy and that the insurance company neither knew nor cared.
 
 
 6
 Hartz conducted a similar session involving the identification of angels and the selection of Tarot cards when Muth and Russo next returned to WCC on August 3, 1992. Hartz also told the couple on that date that she wanted to do a "reading" involving the Bible. Following these sessions, Hartz submitted separate bills to Blue Cross using CPT code 90844 ("individual medical psychotherapy by a physician") for both Muth and Russo on June 30, July 13, and August 3.[4] Hartz also filed a claim with Blue Cross for services rendered to Muth and Russo on July 6, 1992; however, neither Muth nor Russo visited WCC on that date. These claims constitute the basis for Count Four of the indictment.
 
 
 7
 Muth alone returned to WCC on November 2, 1992, when, as promised, Hartz conducted a Bible reading session. During the session, Hartz suggested Muth make a wish that Hartz said would be granted. Hartz again submitted a bill to Blue Cross for this November 2 meeting--the basis for the fifth count of mail fraud--claiming reimbursement under CPT code 90844.
 
 
 8
 William Bengele, another employee of Blue Cross, visited WCC on July 16, 1992. Bengele met with Hartz on that date and told her that he wanted to avoid gaining one to two pounds per year. Hartz offered to treat Bengele's purported weight problem with hypnosis, but Bengele refused. Instead, Hartz discussed diet and exercise with Bengele and suggested two books that he might find helpful. Bengele returned to WCC for counseling on August 5, 1992. He again met with Hartz and the two engaged in a conversation regarding weight loss and their respective families.
 
 
 9
 Hartz subsequently billed Blue Cross for Bengele's diagnostic interview (CPT code 90801) and "individual medical psychotherapy by a physician" (CPT code 90844) on July 16, and for his "individual medical psychotherapy by a physician" (CPT code 90844) on August 5, 1992. In each instance, Hartz listed Bengele's diagnosis as "adjustment disorder, depressed mood"--a diagnosis that was never relayed to Bengele. The government relies on these claims for services rendered to Bengele as the basis for the sixth and final count of mail fraud.
 
 
 10
 Nearly a year later, on July 13, 1993, Darlene Starkey, a WCC employee, was served with a grand jury subpoena requiring her to produce "any and all medical and/or billing records for Robert Nicholas [i.e., Muth], Nancy Nicholas [ i.e., Russo], and William Bengele." As was the practice at WCC, Hartz had not kept medical records for Muth, Russo, and Bengele; therefore, their files contained only billing information. In addition to Starkey, Hartz's colleague, Edna Houchins, was subpoenaed to testify before the grand jury.
 
 
 11
 During this period, Hartz also received a letter indicating that she was the target of a grand jury investigation. Hartz was not subpoenaed to testify before the grand jury, nor was she required to produce any records; rather, she was given the opportunity to testify if she so chose. After receiving the target letter, Hartz created progress reports dated to correspond with the dates she billed Blue Cross for counseling sessions with Muth, Russo, and Bengele, placing the reports in their respective files. Hartz later testified that she feared that "if [she] didn't have anything in there, [she] would have been accused of withholding something and if [she] put them in, at least they were ... to the best of [her] recollection the memories[she] had from what happened." Houchins also created backdated progress reports for her sessions with Muth. None of Hartz's progress notes contains any reference to identifying angels or spiritual animals, nor is there any mention of biblical or Tarot card readings.[5] Moreover, Hartz created progress notes for Muth and Russo dated July 6, 1992, even though neither one visited WCC on that day.
 
 
 12
 Starkey appeared before the grand jury pursuant to her subpoena on July 21, 1993, at which time she produced the files of Muth, Russo, and Bengele, each of which contained the backdated medical records. Prior to testifying on the following day, Starkey admitted to a federal investigator assigned to the case that the progress reports had been produced recently. As a result, Hartz was charged with one count of obstruction of justice for "creating false patient progress notes to be provided to a grand jury."
 
 
 13
 After a three-day jury trial, Hartz was convicted on all seven counts alleged in the indictment. The district court subsequently sentenced her to 21 months imprisonment with three years of supervised release. Hartz was also ordered to pay restitution to Blue Cross in the amount of $737.50.[6]
 
 II.
 
 14
 Hartz's first of three challenges on appeal is that there is insufficient evidence to support four of her mail fraud convictions (Counts 3-6). In order to find the evidence sufficient, we must conclude that, upon viewing the evidence in the light most favorable to the government, a reasonable jury could have found all of the essential elements of each mail fraud count beyond a reasonable doubt. United States v. Smith, 44 F.3d 1259, 1270 (4th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 1970 (1995); United States v. Fiel, 35 F.3d 997, 1003 (4th Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1160 (1995). Thus, the evidence need not be irrefutable; rather, it must be merely sufficient to support the jury's verdict. Furthermore, to sustain a conviction for mail fraud under 18 U.S.C. Sec. 1341, the government must have shown: (1) the existence of a scheme to defraud; and (2) the use of the mails in the execution of that scheme. United States v. United Medical and Surgical Supply Corp., 989 F.2d 1390, 1404 (4th Cir.1993); United States v. Spitler, 800 F.2d 1267, 1279 (4th Cir.1986). Hartz's challenge to her mail fraud convictions focusses solely on the first essential element, i.e., the existence of a scheme to defraud. In order to have established this element sufficiently to sustain a conviction, the government must have shown that the defendant acted with specific intent to defraud. United States v. Ham, 998 F.2d 1247, 1254 (4th Cir.1993).
 
 
 15
 The government's fraud case rested on three alternative theories. First, the government attempted to demonstrate that Hartz intentionally used false procedure codes in order to receive payment from Blue Cross for sessions she knew would be excluded from coverage. Second, the government contended that Hartz knowingly misdiagnosed Muth, Russo, and Bengele, in order to obtain coverage from Blue Cross that otherwise would have been denied. Finally, the government sought to show that Hartz knowingly billed Blue Cross for counseling sessions that did not occur. Proof of any one of these theories beyond a reasonable doubt would support a mail fraud conviction. However, we need not even consider the second and third theories in view of the strength of the evidence in this case supporting the government's first theory.
 
 
 16
 It is undisputed that Hartz signed and submitted bills to Blue Cross for services rendered either by herself or Houchins--neither of whom are physicians--using CPT code 90844 ("individual medical psychotherapy by a physician"). Furthermore, the government presented considerable evidence that the services Hartz billed to Blue Cross were not "medical psychotherapy," but were essentially explorations into the realm of psychic phenomena. In response, Hartz argues that the government's failure to produce expert testimony on the propriety of Hartz's use of CPT code 90844 is fatal to her conviction. However, this argument borders on the absurd. No expert was required to explain to the jury that Muth, Russo and Bengele did not receive medical psychotherapy by a physician.
 
 
 17
 Moreover, based on Hartz's statements to Muth and Russo regarding her willingness to bill hypnosis as a psychiatric aliment and her clandestine practice of claiming insurance monies for Tarot card readings, a reasonable jury could have inferred that Hartz miscoded procedures with the specific intent to defraud Blue Cross. See United States v. Rohn, 964 F.2d 310, 313 (4th Cir.1992); United States v. Metcalf, 388 F.2d 440, 443 (4th Cir.1968) ("[f]raudulent intent must often be inferred from circumstantial evidence. Collateral and related conduct may be considered by the jury for this purpose"). Therefore, particularly when viewed in favor of the government, the evidence surrounding Hartz's use of CPT code 90844 itself is sufficient to support the conclusion that Hartz committed the mail fraud alleged in Counts Three through Six beyond a reasonable doubt.
 
 
 18
 Hartz next argues that there is insufficient evidence to support her obstruction of justice conviction under 18 U.S.C. Sec. 1503. Under Sec. 1503, the elements of obstruction of justice are: "(1) a pending judicial proceeding; (2) the defendant must have knowledge or notice of the pending proceeding; and (3) the defendant must have acted corruptly, that is with the intent to influence, obstruct, or impede that proceeding in its due administration of justice." United States v. Grubb, 11 F.3d 426, 437 (4th Cir.1993). Intentional interference with grand jury proceedings is punishable under Sec. 1503. See id. at 438.
 
 
 19
 Hartz does not contest that a grand jury proceeding was pending at the time she created the backdated progress reports, or that she had actual knowledge of the pendency of the proceeding; rather, she asserts that the progress notes she prepared were accurate and that, in preparing the notes, she did not intend to obstruct the pending grand jury investigation, nor could she have foreseen such a consequence. Although it may be true that the information disclosed in the backdated progress reports was accurate, it is clear that the reports contained material omissions--namely, regarding Hartz's spiritual and biblical counseling sessions. Furthermore, a reasonable jury could have concluded that such omissions were intentional in light of Hartz's prior statements to Muth and Russo and her overall conduct. See United States v. Sun Myung Moon, 718 F.2d 1210, 1236 (2d Cir.1983) ("[i]ntent to obstruct justice is normally something that a jury may infer from all of the surrounding facts and circumstances"), cert. denied, 466 U.S. 971 (1984).
 
 
 20
 In fact, a reasonable jury could conclude that Hartz intended to impede the pending grand jury investigation by the creation of the backdated reports themselves. That Hartz did not create the reports until after she had received notice that she was the target of a grand jury investigation and then backdated the reports, omitting any reference to the fact that the notes were not contemporaneously produced, provides strong circumstantial evidence that Hartz intended to divert or delay the investigation. This evidence is further strengthened by WCC's provider agreement with Blue Cross which, as Hartz acknowledged on cross-examination, required that Hartz keep accurate and current medical records on all Blue Cross patients. Accordingly, the evidence is clearly sufficient, when viewed most favorably toward the government, to support Hartz's obstruction of justice conviction.
 
 
 21
 Finally, Hartz contends that the district court erred in sentencing her by increasing the base offense level for her obstruction of justice conviction. The United States Sentencing Guidelines provide that, "[i]f the offense resulted in substantial interference with the administration of justice ...," then the sentencing court may add three levels to the defendant's base offense level. U.S.S.G. Sec. 2J1.2(b)(2) (1994). " 'Substantial interference with the administration of justice' includes ... any judicial determination based upon ... false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. Sec. 2J1.2, comment (n.1). Only if the district court was clearly erroneous in finding that Hartz substantially interfered with the administration of justice will we disturb her sentence. See United States v. Uwaeme, 975 F.2d 1016, 1018 (4th Cir.1992); 18 U.S.C. Sec. 3742(d). Furthermore, notwithstanding the fact that Hartz was convicted of obstruction of justice, her resulting sentence may validly be enhanced for "substantial interference with the administration of justice." See United States v. Dudley, 941 F.2d 260, 264 (4th Cir.1991) (defendant may properly receive "substantial interference with the administration of justice" enhancement for underlying perjury offense), cert. denied, 502 U.S. 1046 (1992).
 
 
 22
 As Hartz correctly argues, the government was not forced to expend any resources to discover that the backdated progress reports were produced during the course of the grand jury investigation since Starkey admitted this fact prior to her testimony before the grand jury. Hartz does not dispute that these reports necessitated additional witness interviews and forced the government to prepare a rebuttal to the reports, thereby requiring the expenditure of additional government resources. She nonetheless contends that her creation of backdated reports did not operate to conceal the truth and that, in any event, the truth surrounding her involvement in the mail fraud scheme had already been uncovered by the time she produced the notes. This argument misses the point. Admittedly, the government had already uncovered the underlying facts of the case at the time Hartz created the reports, and the creation of those reports did nothing to hamper the discovery of those underlying facts. However, the reports were newly-created items of evidence favorable to the defense that had not existed at the time of the government's original investigation. Because the government bore the burden of proving Hartz's guilt beyond a reasonable doubt, the last-minute creation of the reports required the government to procure additional evidence it would not otherwise have had to obtain in order to prove the invalidity of the reports at trial. Accordingly, the district court was not clearly erroneous in finding that Hartz substantially interfered with the administration of justice.
 
 III.
 
 23
 For these reasons, Hartz's convictions on four counts of mail fraud and one count of obstruction of justice, as well as her accompanying sentences, are
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 Blue Cross/Blue Shield of West Virginia, Inc., has been succeeded by Mountain State Blue Cross/Blue Shield of West Virginia, Inc
 
 
 [2]
 Hartz does not appeal her convictions on Counts One and Two of the indictment. In those two counts, Hartz was charged with unauthorized forgery of the signature of Dr. Stanton Smith--a psychiatrist with whom she had been affiliated until 1987--on Blue Cross claim forms submitted in March and April of 1989
 
 
 [3]
 These standardized codes and their translations were derived from Physicians' Current Procedural Terminology: CPT (1973), a manual originally published by the American Medical Association. Although for initial visits Hartz would also use CPT code 90801 ("diagnostic interview"), on every claim form relevant to this case Hartz listed CPT code 90844 ("individual medical psychotherapy by a physician") as the procedure code; however, in none of those instances were the services rendered by a physician
 
 
 [4]
 In lieu of billing Russo for her August 3 visit, Hartz billed for services rendered on August 13, 1992. The government does not contend that this mistake amounted to fraud
 
 
 [5]
 In her backdated progress notes, Hartz does, however, refer to the use of "collage cards" in order to "help get a psychological handle on what's happening with [Muth and Russo] ..., especially on an individual level."
 
 
 [6]
 In addition to the $737.50 owed to Mountain State Blue Cross/Blue Shield, Inc., the district court concluded that Hartz had defrauded Blue Cross/Blue Shield of West Virginia, Inc., in the amount of $31,064.25. However, the court did not order repayment of this larger sum in light of Hartz's indigence and in view of the fact that Blue Cross of West Virginia had entered receivership