**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kerric R. FOUNTAIN, Defendant–
Appellant.**

**No. 92–5161.**

United States Court of Appeals,
Fourth Circuit.

Argued March 29, 1993.

Decided May 24, 1993.

Raymond A. Carpenter, Jr., Boone, Beale, Carpenter & Cosby, Richmond, VA, argued (David E. Boone, on brief), for defendant-appellant.

Ray B. Fitzgerald, Jr., Asst. U.S. Atty., Roanoke, VA, argued (E. Montgomery Tucker, U.S. Atty., on brief), for plaintiff-appellee.

Before HALL, MURNAGHAN, and WILLIAMS, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

Kerric Fountain was convicted in a bench trial of count I, possession of marijuana with intent to distribute in violation of Title 21 U.S.C. § 841(a)(1) and § 841(b)(1)(D), and of count II, use or possession of a firearm during and in relation to a drug trafficking crime in violation of Title 18 U.S.C. § 924(c).[1]

Fountain was sentenced to two months of incarceration under the sentencing guidelines for the possession with intent to distribute charge, and to a mandatory five year sentence for the firearms charge. He has appealed on the grounds that there was insufficient evidence to support a finding of guilt on the "with intent to distribute" element of the marijuana charge and that thus the finding of guilt on the related charge of possession of a firearm in relation to a drug trafficking crime was error.

On the evening of February 17, 1990, the Staunton, Virginia police received an anonymous call in which a supposedly black male gave information on a person in the area who "was possessing firearms and drugs." The informant said that the individual was a young black male named Kerric Fountain, and was wearing a red jacket and a ball cap. Fountain, the tipster said, could be found at Johnson Street and Cochran Street. The dispatcher relayed the information to Officer James W. Doyle within five minutes of receiving it.

Fountain's counsel objected to the introduction of the dispatcher's testimony on the grounds that it was hearsay. The district court admitted the evidence only for the purpose of explaining why Officer Doyle acted as he did. It was not admitted for the truth of the matter asserted.

Officer Doyle testified that he recognized the area of Johnson and Cochran Streets as "a known area for heavily trafficking in drugs." Upon his arrival at the scene, at approximately 11:20 p.m., Doyle found Fountain located where the informant had indicated and dressed as described. He was walking in the darkness when he was first sighted, and reversed direction and walked away from the police vehicle when it came into view. Officer Doyle testified that he stopped his van, exited, and drew his weapon, asking

1. The government accepted that mere possession would not amount to a "drug-trafficking crime," a requirement necessary for application of the 5 year mandatory sentence, 18 U.S.C. § 924(c)(1), and that possession with intent to distribute had to be proven to establish a drug trafficking crime. *See United States v. Fisher,* 912 F.2d 728, 731 (4th Cir.1990) ("we therefore need not consider Fisher's contention that mere possession should not be considered a trafficking crime for purposes of the firearms statute"). A drug trafficking crime is defined in § 924(c)(2) as any felony punishable under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* Simple possession could not justify a sentence in Fountain's case to imprisonment for more than one year since there had been no prior conviction of Fountain. 21 U.S.C. § 844(a). Thus possession alone in this case did not constitute a drug trafficking crime. We, in view of what was charged, have no occasion to address the question of whether a purchase without intent to distribute may in some cases be a drug trafficking crime under § 924(c)(2).

Fountain to remove his hands from his coat pockets. Fountain, apparently frightened and upset, told Doyle that he had weapons on him, and brought out two guns from his pockets, removing them by the ends of the handles and laying them on the ground. The weapons, a .38 caliber revolver and a .22 caliber automatic, were both loaded.

Doyle took Fountain into custody and transported him to the police headquarters. He did not do a full custodial search at the scene of arrest, but when Fountain was searched at the headquarters, three baggies of marijuana were found in his sock, all contained in another baggie closed with a wire tie. One baggie was larger than the others, but the total amount of marijuana was later found to be 2.3 grams. Fountain also had in his pockets a small amount of change and a package of rolling papers, which are used to roll marijuana cigarettes.

One more prosecution witness in addition to the dispatcher and Officer Doyle was called. David High, a Special Agent with the Drug Enforcement Administration, testified as an expert in the methods of distribution and use of marijuana in the Staunton, Virginia area. He testified that the scenario presented by the prosecution's evidence was one that was consistent with the theory that Fountain was a distributor of marijuana. On cross examination, he admitted that the scenario might also indicate that Fountain was a user. High added on redirect that being a seller and a user were not mutually exclusive.

High testified that the street value of the marijuana found on Fountain could range from $20 per baggie to $5 per baggie, that it was common for marijuana to be packaged in separate baggies for sale, with wire twist ties used to seal the baggies, and that the marijuana found on defendant was in "final retail packaging." He stated that the quantity found on defendant was an "average to small" amount for a street-corner dealer to possess. He said that it was common for drug dealers—both corner salesmen and higher-ups in the hierarchy—to carry guns or firearms. He testified that marijuana is often sold in an "open air market," where people just drive up to a corner where they know that they can obtain drugs and buy from someone standing on the street. The drugs are often stashed in a sock or hat,

rather than in a pocket, he stated, and on cross-examination added that drugs are often stashed behind a nearby bush or held by another person in an open air drug market. On cross-examination Fountain's counsel attempted to elicit the opinion that the absence of a pager or large amounts of money was an indication that someone was not a dealer, but High persisted in his testimony that it was more likely a dealer would carry a gun, and that the fact that Fountain had no money on him could mean only that he had recently paid off his supplier or that no sale had yet been made.

That was, in effect, the prosecution's case, and the court denied Fountain's motions for a verdict of acquittal. Fountain then testified on his own behalf. He said that he had left his residence some mile and a half away from where he was later arrested, on foot, to go to a convenience store and then to a party in the neighborhood. Several days earlier a shooting had occurred in the area and a friend had been killed. Because he was afraid of danger, he testified, he had asked a friend, "Pappa Jones," if he could borrow a gun. "Pappa Jones" offered him the use of two guns, both of which he took and both of which he carried that night when he went to the convenience store and the party.

At the party, Fountain testified, he purchased some marijuana for twenty dollars, and smoked a portion of it outside the party. He had previously bought marijuana in the neighborhood, but did not reveal the person who sold it to him that night. No one else, he said, saw him buy. He had been smoking marijuana for a little less than a year, and had received the $20.00 to buy the marijuana from his girlfriend. He did not show the guns that he carried to anyone at the party. In fact, no one that he could identify knew that he carried both marijuana and guns that night.

Fountain testified that he left the party around 10:30 that night after being told that his cousin, Eric, had come looking for him. He stated that he went out on the street to wait for his cousin. Eric showed up, and tried to get Fountain to come away with him in the car, but Fountain refused and instead tried to get Eric to come into the party. Eric refused and left, telling Fountain to wait

there for him. Fountain waited on the corner—approximately 25 minutes—until Doyle showed up and arrested him.

Fountain's cousin, Eric, also testified. He said he had arrived in Staunton on February 17 at about 10:00 p.m. Upon hearing that Fountain was at a party in the area where trouble had occurred several nights before, he went in his car to the party to get Fountain to come home. He told someone to tell Fountain to come out of the party to see him. Fountain came out, but wanted to stay at the party. Eric told him to remain there—near Johnson and Cochran Streets—and he, Eric, would be back to pick him up. Eric then drove to a nearby store to get some beer, and when he returned a few minutes later Fountain was gone, having been arrested.

Eric testified that he had left Fountain alone on the street corner to go get the beer because the store would be closing soon. The prosecutor questioned why, if he had been worried about Fountain's being in the neighborhood, he left him there while he went to the store. Eric said he didn't drink with or in front of Fountain, and preferred to buy the beer while alone. He was unaware that Fountain smoked or possessed marijuana, and did not know he had the guns.

Several conflicts in the testimony were brought out in closing arguments. Fountain testified that he was handcuffed with his hands in front of him, and moved the marijuana baggies from his pocket to his sock while in route to the headquarters. Doyle maintained that he cuffed Fountain with his hands behind his back. There was some conflict over whether Fountain turned and walked away from Doyle when he approached, and whether Doyle shined a light on him. However, most of the testimony about what happened on February 17 was uncontested. The disagreement between the parties was whether the circumstances created an inference that Fountain had had an intent to distribute.

Reviewing the testimony as favorably to the prosecution as possible, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the truthfulness of High's testimony may be accepted and that of Fountain treated as untrustworthy. The crucial question remains: What evidence of distribution by Fountain was there? We have concluded that, while Fountain's evidence may be disbelieved, it contained nothing which, through disbelief, could be converted to positive proof of distribution of marijuana by him. Similarly, High's statements on that subject amounted at most to speculative suspicion, not to proof beyond a reasonable doubt.

The district court rendered an opinion from the bench, finding Fountain guilty on both counts. It reviewed most of the evidence, conceded that it came down to circumstantial evidence only, but concluded that evaluating the inferences led the court to find an intent to distribute. First, it was troubled by the police informant, and wondered how anyone could have known the information which was given to the dispatcher unless he had actually observed defendant with the drugs and guns. Second, the district court was disturbed by the fact that Fountain, though worried enough about his safety in a high crime neighborhood to be carrying two guns, waited on the street corner—on foot, far from home, late on a cold night—for his cousin to return to pick him up. If he had indeed wanted to stay to go to the party, the district court wondered, why didn't he return to the party? Otherwise, why didn't he leave in the car with his cousin?

Our conclusion is that the factors which led to the district court's conclusion were just suspicions, insufficient enough to sustain a conviction. It also appears that the court placed undue emphasis on the information given to the dispatcher by the informant. That hearsay testimony, which in any case did not establish an intent to distribute, was admitted only to explain Officer Doyle's actions, not for its truth. Yet the district court referred specifically to that testimony as persuasive evidence for its conclusions. We accordingly reverse the count I conviction for possession of marijuana with intent to distribute. The consequential absence of a drug trafficking crime inevitably leads to reversal of the count II conviction for possession of a firearm during and in relation to a drug trafficking crime.[2]

*REVERSED.*

2. The reversal of conviction for both counts makes it unnecessary to investigate whether the

WILLIAMS, Circuit Judge, dissenting:

Because I believe the evidence was sufficient to support the district court's finding of guilt, I respectfully dissent.

The principal factual issue in this case was whether Fountain intended to distribute the marijuana he possessed when he was arrested at 11:20 p.m. Fountain admitted that although he was so scared that he was armed with two loaded revolvers, he stood for over thirty minutes on the street corner on a cold winter night, in an area known for drug dealing, rather than riding with his cousin who had come to get him, returning to the party he claims that he attended, or walking back to his house, one and one-half miles away. After the police took Fountain to the station, they discovered rolling papers and three baggies of marijuana in his sock that were packaged for resale and contained enough marijuana for ten cigarettes. Special Agent High testified that hiding drugs in socks is a normal procedure for drug dealers, and that firearms are commonplace among low-level dealers.

This evidence—the two loaded guns, waiting on foot in a drug trafficking location, the packaging of the drugs, and the place where the drugs were hidden—was sufficient for the district court to conclude that Fountain intended to distribute the marijuana he possessed. In addition, Fountain and his cousin Eric testified, and the district court had the opportunity to evaluate their credibility and factor that into its judgment. The majority opinion, I respectfully suggest, improperly substitutes this court's evaluation of the evidence for that of the district court.

In addition, the majority opinion suggests that the district court relied upon hearsay testimony in reaching its verdict. Fountain raised this point in his post-trial motion for acquittal. In denying the motion, the district court wrote: "The court in no way relied upon the hearsay evidence in making its determination that the defendant was indeed guilty of the charges in the indictment." (J.A. 185.) We should take the district court at its word and evaluate its judgment on the basis of the evidence upon which it in fact relied. Because the evidence, viewed in the light most favorable to the Government, is

sufficient for a "rational trier of facts [to find] the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), I would affirm.

arrest of Fountain leading to the charges was valid.