**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                            No. 94-5912

CARRIE M. LITTLETON,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
John A. MacKenzie, Senior District Judge.
(CR-94-36)

Argued: September 29, 1995

Decided: March 1, 1996

Before HALL and NIEMEYER, Circuit Judges, and BEATY,
United States Judge for the Middle District of North Carolina,
sitting by designation.

_____

Reversed by published opinion. Judge Hall wrote the majority opin-
ion, in which Judge Beaty concurred. Judge Niemeyer wrote a sepa-
rate dissenting opinion.

_____

**COUNSEL**

**ARGUED:** James Orlando Broccoletti, ZOBY & BROCCOLETTI,
P.C., Norfolk, Virginia, for Appellant. Michael R. Smythers, Execu-
tive Assistant United States Attorney, Norfolk, Virginia, for Appellee.
**ON BRIEF:** J. F. Hoen, ZOBY & BROCCOLETTI, P.C., Norfolk,

Virginia, for Appellant. Helen F. Fahey, United States Attorney, W. Barry Huggins, Special Assistant United States Attorney, Norfolk, Virginia, for Appellee.

_____

**OPINION**

HALL, Circuit Judge:

Carrie M. Littleton appeals her convictions for perjury and obstruction of justice, stemming from allegedly false testimony that she gave at a suppression hearing prior to her son's murder trial. We reverse the convictions because, with respect to both charges, the government failed to present any proof of one or more essential elements of the offense.

I.

A.

On July 14, 1992, Antwan Mathis was shot and killed during a drug-related altercation in Hampton, Virginia. A week later, the police arrested Littleton's son, Derrick Kelley, for alleged involvement in the murder. Kelley, who was interrogated without a lawyer present, made a number of self-incriminating statements, and he was eventually indicted for the murder by a federal grand jury. Kelley moved to suppress the statements, asserting, inter alia, that he had, prior to being questioned, requested and been denied the assistance of counsel.

The suppression hearing was held on April 4, 1994, nearly two years following Kelley's arrest. Littleton, who is a Master Sergeant in the Air Force, testified that she was on duty at the Langley base hospital the day her son was arrested. Littleton said that Kelley telephoned her at about 3:15 p.m. and requested that she come to the police station and get him a lawyer. Littleton stated that she received permission from her supervisor, Major Ruth Depalantino, to leave work. According to Littleton, she arrived at the Carmel Center for Justice at about 3:45, and asked to see Kelley. [1] Littleton noted that

_____

[1] Kelley was actually being held at the Public Safety Building, directly across the street from the Carmel Center. Photographs introduced at trial

2

while she waited in the reception area, she encountered "another couple that came in concerning the lady's son." [2] Littleton testified that Detective Myron Bittenbender came to the reception area at about 6 p.m. and advised her to go home because Kelley had not yet been charged.

On cross-examination, Littleton was asked about being visited at her home by Bittenbender and Detective Kenneth Seals a couple of days before Kelley's arrest. Littleton said that she had told the detectives that Kelley did not live with her and her husband, Ervin Littleton. She flatly denied telling Seals that she had thrown Kelley out for dealing drugs.

After the defense rested, the court heard argument on the motion to suppress:

> [AUSA] SMYHERS: Your Honor, we could call Detective Bittenbender, obviously, to say there's been some contrary testimony here, but I don't think it's really relevant to the suppression motion.
>
> THE COURT: All right. The only witness that would be helpful to the court would be [one] resolving the suppression motion. Of course, there's always conflicts and the court is faced with what it will do. Do you wish to argue?
>
> [AUSA] GROENE: Yes, Your Honor. Assuming arguendo for a second that Mrs. Littleton's testimony is true, so what? She is in no position to exercise any . . . rights on

---

reveal that both buildings are constructed of brick and appear to rise about two stories above ground level, although the Public Safety Building is slightly darker in color and is of an obviously more modern design. Both are clearly identified by block letters attached to the front or side of the structure; the letters on both buildings are of identical style.
[2] Cynthia Johnson and her fiance, Gregory Stewart, testified at Littleton's trial that they had come to the police station upon learning that Johnson's son was also being questioned in connection with the murder investigation.

3

behalf of her son. . . . [Kelley] never unequivocally requested the assistance of counsel, never unequivocally requested for all questioning to cease, and, therefore, there was nothing for Detective Seals and Detective Bittenbender to scrupulously honor. . . . We believe [Littleton] was never there. But assuming arguendo that she was there, it doesn't affect, in the government's view, the merits of the confession given by Derrick Kelley. . . . So anything the mother could or could not have done anywhere she could have been that day is immaterial and completely irrelevant. . . .

The district court denied the motion to suppress, commenting briefly on Littleton's testimony:

> The court's conclusion on all the conflicting testimony regarding whether Ms. Littleton was at the station or not . . . or who she talked to or what room she was in is that notwithstanding her testimony, even if you assume that she was there, even if you assume that as she testified, she was there and could not see her son, the court does not find a violation of the defendant's Sixth Amendment rights.. . . Mr. Kelley's rights are personal in nature and he certainly has the authority to invoke those rights, and there's no evidence . . . that Mr. Kelley requested that he be permitted to have a lawyer come in.

Notwithstanding the court's denial of the motion to suppress, Kelley was acquitted of the murder charge.

B.

On May 24, 1994, the grand jury indicted Littleton for perjury and obstruction of justice, based on her testimony at the suppression hearing. The indictment charged that Littleton falsely testified that she (1) received a telephone call from her son the afternoon of his arrest, (2) asked Major Depalantino's permission to leave work, (3) traveled to the police station and spoke with Detective Bittenbender, and (4) did not tell the detectives that Kelley had been forced to leave her home because of his drug dealing.

4

Littleton was tried before a jury. The government's evidence consisted solely of the testimony of Detectives Seals and Bittenbender, and a joint stipulation concerning Major Depalantino.

1.

Detective Seals testified first about his conversation with Littleton at her home. Seals testified that Littleton had told him that she had made Kelley leave because he had been associating with "bad people" who were involved in selling drugs. Seals noted that, at the suppression hearing, Littleton had denied making such a statement.

Seals then testified concerning Kelley's arrest. Seals said that, on July 21, 1992, he had assisted in executing a search warrant of Kelley's residence at about 10:30 a.m., that he had personally informed Kelley of his rights, and that Kelley had been taken to the police station at the Public Safety Building between 11:30 and noon. Seals identified photographs of the Public Safety Building and the Carmel Center for Justice, see note 1, supra . He confirmed that he had not taken Kelley to the Carmel Center following the arrest; indeed, Seals denied having been at the Carmel Center anytime that day.

Seals said that he and Detective Bittenbender took Kelley to an interrogation room at the Public Safety Building, and that Kelley remained there throughout the entire day. He explained that the room had no windows and no telephone. There was only one door, which opened directly onto the main working area for the detectives in Seals and Bittenbender's unit. Seals admitted that he and Bittenbender left Kelley alone for a time, but noted that department policy required them to have asked another detective to watch the interrogation room door. Seals was certain that he had made such a request, but could not remember of whom. Seals steadfastly denied having allowed Kelley any phone calls until after he had been taken to the city jail.[3]

_____

[3] An inventory of Kelley's personal property, filled out at the Hampton City Jail, was introduced through Seals; the inventory indicates that Kelley indeed telephoned Littleton, but not until 8:07 p.m.

5

2.

Detective Bittenbender essentially corroborated Seals's version of what Littleton had said during her initial encounter with the detectives. Regarding the arrest, Bittenbender verified that Kelley had been taken to the Public Safety Building for interrogation, and that he had occasionally been left alone during breaks in the questioning. Bittenbender recalled having seen, and perhaps having spoken with, Cynthia Johnson at the Public Safety Building sometime during the course of the afternoon. See note 2, supra. He adamantly denied having had any similar contact with Littleton that day.

3.

Major Depalantino did not arrive to testify at the scheduled time. The parties stipulated that Depalantino would have testified that she did not succeed Major Karen Reed as Littleton's supervisor until August 24, 1992, and, therefore, could not have given Littleton permission to leave work on July 21, 1992.**4**

_____

**4** Littleton presented substantial testimony in her defense. Kelley testified that at about 2:00 or 3:00 p.m. on the day of his arrest, Seals accompanied him to a telephone near the interrogation room so that he could call his mother; he also testified that Bittenbender later told him that Littleton had stopped by to see him. Johnson and Stewart, who admitted to only a passing acquaintance with Littleton, both testified that they had seen her at the Public Safety Building, see note 2, supra.

Ervin Littleton testified that, when the detectives had visited his home to speak with his wife, he had overheard most of the conversation and had never heard either Seals or Bittenbender inquire as to why Kelley had vacated the residence. Littleton herself testified that she had simply mistaken the Carmel Center for the Public Safety Building because she had been too upset about her son to accurately note the building's name upon her arrival. She attributed her erroneous testimony regarding her supervisor's name to the nearly two years that had passed between her son's arrest and the suppression hearing. Littleton insisted, however, that she had not been mistaken about her son's phone call, her subsequent encounter with Bittenbender at the police station, and the substance of her conversation with the detectives at her home a few days earlier.

C.

At the close of all the evidence, Littleton moved for a judgment of acquittal. In response, the district court withdrew from the jury's consideration the question of whether Littleton had violated the law by testifying incorrectly regarding her supervisor's name:

> I have omitted or have rejected any claim of whether or not permission was given to Mrs. Littleton to leave the hospital by Major Depalantino or whether it was by her real supervisor . . . because I don't believe that that's material in the case, and it would have to be a material matter in order to warrant you able to sit.

The remainder of the indictment was submitted to the jury, which found Littleton guilty of both charges. The district court fined Littleton $1000 on each count, and it sentenced her to prison for five months. Littleton has remained free on bond during the pendency of this appeal.

II.

A.

Littleton was convicted of violating 18 U.S.C. § 1623, which provides, in pertinent part:

> (a) Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C.A. § 1623(a) (West Supp. 1995). Not every untrue declaration before a court or grand jury violates the statute; it is essential that the statement also be material to the government's inquiry. United States v. Farnham, 791 F.2d 331, 333 (4th Cir. 1986); United States v. Flowers, 813 F.2d 1320, 1325 (4th Cir. 1987). Because materiality is an essential element of a § 1623 offense, an accused is entitled to

7

have the jury determine the materiality of the allegedly false statement beyond a reasonable doubt. See United States v. Gaudin, 115 S. Ct. 2310, 2320 (1995) (construing the materiality element of 18 U.S.C. § 1001).**5**

A statement is material if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed. Kungys v. United States, 485 U.S. 759, 770 (1988). Thus, the relevant inquiry in the instant proceeding is whether Littleton's testimony in the Mathis murder case regarding the supposed telephone call from her son, her subsequent encounter with Bittenbender at the police station, or the substance of her conversation a few days earlier with Seals and Bittenbender could have influenced the district court to suppress Kelley's confession on the ground that he had unlawfully been refused access to a lawyer prior to being questioned.

B.

Regardless of whether the district court presiding over the suppression hearing believed that Kelley had telephoned Littleton and asked her to obtain a lawyer to represent him, it would not have been constrained to suppress the confession unless it had also found that Kelley had made a similar request of Seals and Bittenbender.**6** Indeed, this was the gist of the argument made by the government at the suppression hearing, and was the sole basis underlying the district court's ruling denying the motion. See Section I-A, supra.**7**

_____

**5** The court's instructions to the jury in the instant case were not transcribed for the record. At oral argument, the parties represented that the jury had been instructed as to the materiality element. We are surprised by this revelation inasmuch as, prior to Gaudin , it was settled in this circuit that the question of materiality was one of law, and thus within the trial court's exclusive province. United States v. Paolicelli, 505 F.2d 971, 973 (4th Cir. 1974).

**6 See Poyner v. Murray**, 964 F.2d 1404, 1410 (4th Cir.) ("A suspect's right to have counsel present . . . attaches only when the suspect invokes that right during custodial interrogation by indicating in some manner that he wishes to consult with an attorney before speaking.") (emphasis supplied), cert. denied, 113 S. Ct. 419 (1992).

**7** Littleton maintains that, because the government argued at Kelley's suppression hearing that her statements were immaterial, it is now estop-

As the district court stated at the suppression hearing, there was <u>no</u> positive evidence that Kelley requested of either detective that he be permitted to consult with a lawyer. Seals and Bittenbender both testified that Kelley made no such request; however, even had the court, as a result of Littleton's testimony concerning the collateral matters, decided that Seals and Bittenbender lacked credibility -- and thus, the detectives' testimony of their dealings with Kelley could not be believed -- it nevertheless could not have suppressed Kelley's confession based on nothing more than its disbelief. <u>See United States v. Fountain</u>, 993 F.2d 1136, 1139 (4th Cir. 1993) (absent positive evidence of drug distribution, a conviction for possession of marijuana with the intent to distribute could not be sustained merely because the trier of fact disbelieved the defendant's evidence).

We reach the inescapable conclusion that Littleton testified to nothing at the suppression hearing that could have conceivably influenced the district court to suppress her son's confession. Her entire testimony was, therefore, immaterial to the court's inquiry, and, as a result, her perjury conviction must be reversed.

III.

Littleton was also found guilty of obstruction of justice, in violation of 18 U.S.C. § 1503. That statute provides, in pertinent part:

> (a) Whoever corruptly . . . endeavors to influence . . .
> or impede any . . . officer . . . in or of any court of the
> United States . . . in the discharge of his duty . .., or cor-

_____

ped from asserting the opposite position in her subsequent prosecution. <u>See Flowers</u>, 813 F.2d at 1327 (doctrine of judicial estoppel may apply to prosecutions under § 1623). Inasmuch as Littleton failed to raise this argument below, our review of the district court's failure to dismiss the perjury charge <u>sua sponte</u> would be limited to plain error. <u>United States v. Olano</u>, 113 S. Ct. 1770, 1776 (1993). We choose not to address the issue, however, because we have determined that Littleton's perjury conviction cannot stand in any event. <u>See Flowers</u>, 813 F.2d at 1327 (declining to reach the defendant's judicial estoppel argument because insufficient evidence of materiality necessitated reversal of the conviction).

9

> ruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished [by]
>
> . . . .
>
> (b) . . . imprisonment for not more than 10 years, a fine under this title, or both.

18 U.S.C.A. § 1503 (West Supp. 1995). To be guilty of obstructing justice under § 1503, a defendant must have knowledge or notice of a pending judicial proceeding, and must have acted with the intent to influence, obstruct, or impede that proceeding in its due administration of justice. United States v. Grubb, 11 F.3d 426, 437 (4th Cir. 1993).

We acknowledged in Grubb that perjury can constitute the actus reus of a § 1503 violation, but that "an obstruction of justice prosecution cannot rest solely on the allegation or proof of perjury; rather, what also must additionally be proven is that the false statements given, in some way, either obstructed or were intended to obstruct the due administration of justice." Id.

As we have already held in the preceding section, the government's evidence was insufficient to prove that Littleton committed perjury, in that it failed to demonstrate that her allegedly false statements were material to the judicial proceeding in which they were received. The government's evidence was likewise insufficient to permit the jury to ascertain that Littleton intended to obstruct justice. There was, for example, no direct or circumstantial evidence that Littleton had contrived with Kelley, his attorney, or any of the defense witnesses to fabricate her story.[8] In fact, there was no evidence that Littleton even understood the significance of her testimony as it related to the sup-

_____

[8] Had such an agreement existed, the defense surely could have presented a much stronger case at the suppression hearing by calling Johnson and Stewart to corroborate Littleton's testimony. Instead, Littleton merely evinced a vague recollection of "another couple" that had been at the police station. See note 2, supra , and accompanying text.

10

pression hearing. The closest that the government came to producing such evidence was during its cross-examination of Littleton herself:

> Q. Now, when you testified on April 4th at the suppression hearing you were called by the first attorney that questioned you, the person who wanted you there was your son's attorney, isn't that true?
>
> A. Yes.

. . . .

> Q. And you understood the importance of what that suppression hearing was about, isn't that true?
>
> A. Yes.
>
> Q. You understood that it was possible that your son's confession could be kept out of any evidence in any future trial of your son, isn't that true?
>
> A. Yes.
>
> Q. So you wanted the Court to rule in favor of your son; isn't that true?
>
> A. Yes.

That Littleton understood the purpose of the suppression hearing, was aware of the importance of the evidence that Kelley sought to suppress, and desired the district court to grant her son's motion, does not establish that she understood how her testimony would assist in accomplishing that objective.[9] Had the government elicited a more

---

[9] **Cf. Grubb** at 437-38. In that case, tape-recorded conversations provided ample evidence to support an inference that the defendant, by lying to an FBI agent who he knew was assisting a grand jury investigation into political corruption in Logan County, West Virginia, believed that he could thwart the investigator from discovering that the defendant was himself corrupt.

11

specific account of what Littleton hoped to achieve by testifying, the jury might have been able to infer the necessary intent. Instead, all the government proved was that Littleton had a motive to lie, and that, by itself, is clearly insufficient to establish the requisite mens rea under § 1503.

Because the government failed to prove either the act or intent necessary to establish a violation of 18 U.S.C. § 1503, Littleton's conviction for obstruction of justice cannot stand.

IV.

Littleton's convictions for perjury and obstruction of justice are

REVERSED.

NIEMEYER, Circuit Judge, dissenting:

Carrie Littleton testified falsely at a suppression hearing before the district court that her son called her at work at 3:15 p.m. on July 21, 1992, and requested her to come to the police station and obtain a lawyer for him and that she arrived at the police station at 3:45 p.m. for that purpose. By giving this testimony, Littleton intended to corroborate her son's position that during detention he had requested a lawyer and therefore his statements, incriminating him in a murder, were taken in violation of his Sixth Amendment right to counsel. Littleton's testimony was intended to support her son's position.

While it is true that at the suppression hearing the Assistant United States Attorney downplayed the effect of Littleton's testimony by stating that "[Littleton] is in no position to exercise any . . . right on behalf of her son," the fact remains that even though exercising a right to counsel belonged to Littleton's son and not to Littleton, her testimony was material because it tended to corroborate her son's position that he asked for counsel. The question whether Littleton's son asked for counsel was a critical issue at the suppression hearing at which Littleton testified. Whether the testimony actually influenced the court in deciding the motion to suppress is irrelevant so long as it was intended to influence the court. Cf. Kungys v. United States, 485 U.S.

12

759, 770 (1988) (recognizing test for materiality as whether misrepresentation "has a natural tendency to influence, or was capable of influencing" the court) (citation omitted).

Because Littleton's testimony at the suppression hearing was false, was intended to corroborate her son's legal position at the hearing, and was intended to influence the court to grant the motion to suppress, Littleton was properly convicted of perjury. In addition, she was also properly convicted for obstruction of justice because her perjury was intended to obstruct the court's effort to reach the truth at the hearing. I cannot imagine a scenario that would accommodate Mrs. Littleton's making up facts about a telephone conversation and a visit to the police station for the purpose of obtaining counsel if it were not intended to help her son and frustrate the prosecution's efforts. Because this conduct violated the statutes under which she was convicted, I would affirm her convictions.

Accordingly, I dissent.

13