**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 24 1998**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee-
Cross-Appellant,

v.

MONSON LEE DURHAM, also known
as Lee Durham,

     Defendant-Appellant-
Cross-Appellee.

Nos. 96-5107 & 96-5118

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

DANNY RAY EVANS, also known as
Danny Taylor,

     Defendant - Appellant.

No. 96-5108

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 95-CR-31-K)**

---

Jenine M. Jensen, Assistant Federal Public Defender (Michael J. Katz, Federal Public Defender with her on the briefs), Denver, Colorado, for Defendants - Appellants Durham and Evans.

Allen J. Litchfield, Assistant United States Attorney (Stephen C. Lewis, United States Attorney and Ann P. Dooley, Assistant United States Attorney, on the Brief), Tulsa, Oklahoma, for Plaintiff - Appellee.

---

Before **TACHA**, **LUCERO** and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Today we are asked to consider the requirements for waiver of a defective jury composition, what constitutes sufficient evidence of materiality under 18 U.S.C. § 1623, whether it is appropriate to issue a false exculpatory statement instruction when the defendant is charged with perjury, and whether it is misconduct for the government to request a modification to an official transcript without notifying the court or opposing counsel. In addition, we revisit our jurisprudence under <u>Bailey v. United States</u>, 116 S. Ct. 501 (1995), to determine whether the erroneous "use" instruction in this case requires this court to reverse Danny Evans's conviction under 18 U.S.C. § 924(c)(1).

In addition to the § 924(c) appeal, Evans appeals his conviction for one count of conspiracy with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. Lee Durham appeals his convictions for participating in the same conspiracy and for four counts of perjury in violation of 18 U.S.C. § 1623. Durham claims that the government did not present sufficient evidence to support his convictions for perjury; that the district court erred in giving a false exculpatory statement jury

2

instruction; that his trial was defective as a result of prosecutorial misconduct; and that he was tried before an improperly constituted jury. In addition to joining all grounds raised by Durham, Evans argues that the district court abused its discretion by refusing to sever his trial from Durham's; that the Supreme Court's decision in Bailey mandates reversal of his conviction under 18 U.S.C. § 924(c); and that the district court contravened his Sixth Amendment right to confront adverse witnesses by refusing to allow inquiry into prior assaults committed by Mark Montgomery, the government's key witness. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I

Mark Montgomery began selling cocaine in Okmulgee, Oklahoma in 1989. Early in his career, Montgomery's great uncle informed him that he was paying too much for his cocaine from his Okmulgee sources. Soon thereafter, Montgomery developed alternative cocaine sources in both California and Texas. At trial, Montgomery testified he first obtained cocaine from Evans, a resident of Arlington, Texas, in either 1990 or 1991. From 1991 to 1994, he and Evans ran the cocaine venture as partners.

In early 1991, Montgomery enlisted Durham to broker his purchases of cocaine in Houston. Durham, a Houston native, would pick Montgomery's couriers up at one of the city's airports and provide them with a place to stay. He would then take their money, exchange it for cocaine, and transport them back to the airport. Durham was paid "small amounts of money" for his services as a "middle man." 13 R. at 1603-04. He never

3

brokered any of Montgomery's drug transactions in other source cities.

Montgomery introduced Evans and Durham sometime before August 1991. Thereafter, Evans would contact Durham to arrange cocaine purchases without Montgomery's intervention. In mid-1992, Evans and Montgomery ceased employing Durham's services and there is scant evidence suggesting any contact between Durham and either Montgomery or Evans for the latter half of 1992 and all of 1993 and 1994.

In June 1994, Evans was stopped in Oklahoma for speeding. During that stop, an officer of the Oklahoma Highway Patrol found a nine millimeter pistol between the driver's and passenger's seats. In addition, the officer found $13,500 in three separate bundles. Because Evans admitted that the pistol was his, he was arrested for carrying a loaded weapon in violation of Oklahoma law. On the theory that the $13,500 represented the proceeds of drug transactions, Evans was subsequently charged with using or carrying a firearm during and in relation to a drug offense in violation of 18 U.S.C. § 924(c)(1).

Montgomery was arrested in October 1994 for illegal distribution of narcotics. In an attempt to limit the amount of prison time he would serve, he agreed to assist the government in obtaining evidence against other suspected drug dealers. He was therefore released on bond the following month. Initially, Montgomery had little success in contacting his former sources and he surmised that they suspected him of cooperating with the government. In March 1995, however, Montgomery successfully contacted Durham. In a taped conversation that was played for the jury, Durham agreed to locate a

4

cocaine seller for Montgomery. Later that month, the government obtained an indictment against both Evans and Durham for conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. Montgomery was the government's key witness at the defendants' trial.

## II

Prior to trial, Durham's counsel moved the court to dismiss the indictment for improper venue or, in the alternative, to transfer the case pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure. Durham testified at a hearing held on June 14, 1995 in support of this motion. His testimony prompted the government to file a superseding indictment that added four counts of perjury. The first perjury count was based on Durham's representation at the venue hearing that he had not been in Oklahoma since December of 1990, see 13 R. at 1631-32, 1640; the second, on his confirmation that he had "never taken any money from" Evans, see id. at 1632-33; the third, on his adoption of the statement that he had never sold drugs to Evans, see id. at 1633; and the final count, on his confirmation that he had never engaged in a drug transaction with Montgomery, see id. at 1641.

## A

Durham argues that all of his perjury counts must be reversed because the government did not produce sufficient evidence that his statements were "material" to the proceedings. "[I]n reviewing the sufficiency of the evidence to support a jury verdict,

5

this court must review the record de novo and ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.) (internal quotations omitted), cert. denied, 117 S. Ct. 226 (1996).

Materiality is an element of the crime of perjury, which must be submitted to the jury and proven by the prosecution beyond a reasonable doubt. See 18 U.S.C. § 1623(a); United States v. Regan, 103 F.3d 1072, 1081 (2d Cir.), cert. denied, 117 S. Ct. 2484 (1997); United States v. Keys, 95 F.3d 874, 877 (9th Cir. 1996) (en banc); United States v. Littleton, 76 F.3d 614, 617 (4th Cir. 1996); United States v. Kramer, 73 F.3d 1067, 1074 (11th Cir.), cert. denied, 117 S. Ct. 516 (1996); see also United States v. Gaudin, 515 U.S. 506, 522-23 (1995) (conviction for making false statements on federal loan documents in violation of 18 U.S.C. § 1001 only sustainable if jury finds statements material beyond a reasonable doubt). To be material under § 1623(a), a false statement must have "a natural tendency to influence, or [be] capable of influencing, the decision . . . required to be made." United States v. Girdner, 773 F.2d 257, 259 (10th Cir. 1985) (quoting United States v. Moore, 613 F.2d 1029, 1038 (D.C. Cir. 1979)); see also Gaudin, 515 U.S. at 509 (applying this same standard in prosecution under 18 U.S.C. § 1001). Because Durham made the disputed statements at a venue hearing, the government must

6

prove the statements were material to the court's venue decision. See United States v. Allen, 892 F.2d 66, 68 (10th Cir. 1989) ("The materiality test is determined at the time and for the purpose for which the allegedly false statement was made.").

Because "[v]enue is proper in conspiracy offenses in any district where the agreement was formed or an overt act occurred," United States v. Scott, 37 F.3d 1564, 1580 (10th Cir. 1994) (citations omitted), Durham's testimony was material to the venue decision.[1] The indictment in effect at the time of the venue hearing did not allege any specific overt acts. Rather, it merely charged Evans and Durham with conspiring to violate 18 U.S.C. § 841(a)(1) "in the Northern District of Oklahoma and elsewhere." 1 R., Doc. 2 at 1. It would be consistent with the charges in that indictment for the government to establish that the agreement was formed in Oklahoma but that all overt acts occurred outside of the state.[2] It is for that reason that Durham's statements were material to the venue decision.

Durham's contentions that he had left Oklahoma before the alleged conspiracy was formed and had no contact with the principal alleged conspirators had the capacity to

---

[1]   Durham objects that none of the disputed testimony was relevant to the convenience of holding trial in the Northern District of Oklahoma rather than in the Southern District of Texas, rendering it immaterial to the venue proceedings because past events could not have swayed the court's evaluation of present inconvenience. That objection is without merit because his motions to the court challenged the propriety of venue as well as the convenience of that forum. See 1 R., docs. 18 & 19; 13 R. at 1624.

[2]   In fact, Durham's motion before the district court challenging the propriety of venue rested in part on the assertion that the "crimes alleged against . . . Durham were committed in the Southern District of Texas." 1 R., Doc. 19, at 4.

7

affect the district court's decision as to whether an agreement had occurred in Oklahoma.

Moreover, Durham's motion before the court argued that he was inappropriately being

tried in Oklahoma for acts that had allegedly taken place in Texas. If the court had

credited Durham's testimony at the venue hearing, it might have concluded that no

agreement was formed in Oklahoma and that the overt acts occurred outside of that state.

Such findings could certainly have influenced the court's venue decision, and it is

therefore reasonable for the jury to have found the statements material to that decision.[3]

## B

Durham also claims that the government presented insufficient evidence to show

that his claim not to have been in Oklahoma since 1990 was "knowingly" false. More

specifically, he argues that his testimony as to when he left Oklahoma shows such

confusion and equivocation that no jury could reasonably conclude he made a willful

misstatement.[4] We cannot agree.

A perjury conviction that rests on a defendant's responses to leading questions

should be "strictly scrutinize[d] for fairness" to ensure that the statements are those of the

witness and not the prosecutor. See United States v. Boberg, 565 F.2d 1059, 1063 (8th

---

[3]  The jury was fully equipped to determine whether Durham's statements were material to the venue proceeding. It was aware that Durham was objecting to the propriety and convenience of the forum. See 13 R. at 1624. And, it received proper instructions on the legal standards for materiality, see 15 R. at 1978, and appropriate venue in a conspiracy case, see 15 R. at 1969.

[4]  Durham also argues that the ambiguous nature of that testimony is aggravated by the alteration of the transcript that was presented to the jury. See infra Part III.

8

Cir. 1977). In this case, however, the defendant testified that he left Oklahoma in 1990 not only during cross-examination but also in response to a question from his own attorney. See 13 R. at 1640. Drawing all inferences in favor of the government, see Voss, 82 F.3d at 1524-25, the evidence adduced at trial was sufficient to prove that Durham knew that he was making a false statement.

### III

Our review of this appeal is complicated by the government's improper submission of an altered transcript to the jury. To prove Durham perjured himself in testifying that he left Oklahoma in 1990, the prosecution read the following statement to the jury:

> ANSWER: I left Oklahoma in December of '92, probably December of '90, I believe.

13 R. at 1628. But according to the court reporter who was present at the venue proceeding, the original transcript read as follows:

> ANSWER: I left Oklahoma in December of '92 -- probably December of 2'90, I believe.

Supp. R. (Letter from Eldon R. Simpson, U.S. Court Reporter, to Patrick Fisher, Clerk of the 10th Circuit Court of Appeals, of 8/1/97, at 1).

The government tells us that the Assistant United States Attorney assigned to this case noticed what he believed to be an error in the original transcript of the venue proceeding and brought it to the attention of the court reporter, Eldon Simpson. According to the government, Mr. Simpson then "corrected the transcript" prior to filing

9

it, but forgot to save the "corrections" on his computer, thus leaving the defense with an erroneously nonconforming copy of the transcript. Appellee's Br. at 22. The government's request to modify the official transcript was made without informing the court or opposing counsel.

Because neither defendant objected to the use of the altered transcript, we review the claim of prosecutorial misconduct for plain error. See United States v. Sands, 968 F.2d 1058, 1063 (10th Cir. 1992). We may not correct the alleged error unless there is: (1) an error; (2) that is plain, and (3) that affects substantial rights. Johnson v. United States, 117 S. Ct. 1544, 1549 (1997). Even if those conditions are met, we will only reverse and remand if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations omitted).

There is no question but that the prosecutor acted inappropriately. Although the Federal Rules of Criminal Procedure provide that "[c]lerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time," Fed. R. Crim. P. 36 (emphasis added), nothing in the rule may be read to allow counsel to request modification of a transcript without informing the court or opposing counsel. It makes no difference that the transcript had not yet been filed. The potential for severe misconduct is such that all requests concerning an alteration of a transcript must be made through the court.

That said, we do not accept Durham's contention that such behavior requires

reversal in the case before us because it did not "affect[] substantial rights." Johnson, 117 S. Ct. at 1549. Indeed, upon review of the record, we see no possibility that the misconduct at issue affected the verdict. Both the original and modified transcripts indicate that Durham was initially confused about when he left the state of Oklahoma. In his testimony following the disputed section, however, Durham consistently maintained that the last time he had been in Oklahoma was in 1990. See 13 R. at 1631-32, 1640, 1641. To the limited extent that the jury may have been able to infer a higher degree of confusion from the unaltered transcript, the role of that single comment is not significant in light of Durham's subsequent, conclusive statements that he had not been to the state of Oklahoma since 1990.

## IV

Durham and Evans both appeal the district court's decision to instruct the jury that it could consider false exculpatory statements made by Durham as evidence of Durham's consciousness of guilt. The defendants claim that this instruction erroneously relieved the jury of its obligation to determine the falsity of Durham's statements. Thus, defendants contend, the instruction effectively directed a verdict on the perjury counts and tainted the conspiracy conviction by informing the jury that Durham's claim to have had no drug dealings with either Evans or Montgomery was false.[5] We review jury instructions as a

---

[5] The government argues that Evans failed to preserve this issue because he did not object to the instruction at trial. We need not, and therefore do not, reach this issue.

11

whole and apply a de novo standard of review to determine the propriety of an individual jury instruction to which objection was made at the time of trial. See United States v. Scarborough, 128 F.3d 1373, 1377 (10th Cir. 1997) (citing United States v. Mullins, 4 F.3d 898, 900 (10th Cir. 1993)).

To prove perjury, the government must establish beyond a reasonable doubt that: (1) the defendant made a declaration under oath before a federal court; (2) such declaration was false; (3) the defendant knew the declaration was false; and (4) the declaration was material. See 18 U.S.C. § 1623(a); United States v. Neal, 822 F.2d 1502, 1506 (10th Cir. 1987) (citing Hale v. United States, 406 F.2d 476, 479 (10th Cir. 1969)). The jury in this case was so instructed. See 3 R., doc. 108 at 48. The instruction on false exculpatory statements, which this court allows to prove consciousness of guilt, see United States v. Ingram, 600 F.2d 260, 262 (10th Cir. 1979), does not require otherwise. This latter instruction merely informs the jury that it may infer consciousness of guilt from an exculpatory statement if, in the light of other evidence produced at trial, the jury determines that the defendant knew the statement was false when it was made.[6] The

---

[6] The instruction submitted to the jury stated in part:

When a defendant voluntarily offers an explanation or voluntarily makes some statement tending to show his innocence and it is later shown that the defendant knew that the statement or explanation was false, the jury may consider this as showing a consciousness of guilt on the part on the part of the defendant Monson Lee Durham, Jr. . . . since it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending

(continued...)

12

instruction simply does not require the jury to consider any statement false.[7]

Yet defendants' argument is not entirely without merit. The statements made by Durham in which he denied participating in any drug transactions with Evans and Montgomery were essentially denials of the conspiracy charged in the indictment. The only way the jury could find that the statements at issue in this case were false would be to conclude that Durham was a member of Montgomery's cocaine distribution conspiracy. That conclusion would necessarily render irrelevant consciousness of guilt. This circularity problem recurs whenever a jury can only find an exculpatory statement false if it already believes other evidence directly establishing guilt. Under such circumstances, it is error to give a false exculpatory statement instruction. See United States v. Littlefield, 840 F.2d 143, 149 (1st Cir. 1988).

Nevertheless, a faulty jury instruction only requires reversal if the error is prejudicial. See Dikeman v. National Educators, Inc., 81 F.3d 949, 955 (10th Cir. 1996). Here, "[t]he instruction's effect could not be prejudicial because it [was] redundant."

_____

[6]   (...continued)
to establish his innocence.

3 R., doc. 108 at 49-50 (emphasis added). This instruction was taken from the Devitt & Blackmar treatise. See 1 Edward J. Devitt et al., Federal Jury Practice and Instructions § 14.06 (4th ed. 1992).

[7]   Although neither defendant raises this issue precisely, we also note that the instruction on false exculpatory statements does not direct a verdict on the "knowing" element of the crime of perjury. By its own terms, the instruction does not become relevant to the jury's deliberations until the jury has already found that the defendant knew that the statement was false when he made it. See 3 R., doc. 108 at 49-50.

Littlefield, 840 F.2d at 150. By its own explicit terms, the false exculpatory statement instruction was of no relevance to the jury until it determined that the defendant knowingly made a false statement tending to establish his innocence. To make that determination, the jury must have already independently concluded that Durham was a member of Montgomery's drug conspiracy. The court's instruction that it could consider false exculpatory statements as evidence of Durham's consciousness of guilt only allowed the jury to "re-prove" what it had already found to begin with, that Durham was guilty of conspiracy. Consequently, the instructional error was harmless.

## V

The defendants claim that the use of a juror from outside of the district in which the trial occurred is constitutional and statutory error that requires this court to reverse their convictions. The Sixth Amendment provides that a criminal defendant is entitled to a trial "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1878, also guarantees the right of a criminal defendant to a "petit jur[y] selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. During the second week of trial, the district court became aware that one of the jurors on the panel had moved out of the Northern District of Oklahoma. Outside the presence of the defendants, the district judge informed counsel for the government and the defense that the juror would have to be

14

replaced "unless you all waive the situation." 14 R. at 1798. Although it is unclear whether the defendants were consulted about the decision, all the attorneys waived the defect. See id. at 1802-03.

The defendants argue that their right to a properly constituted jury is fundamental and that any waiver that appears in the record is inadequate because there is no evidence that the defendants personally waived such rights. "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." United States v. Olano, 507 U.S. 725, 733 (1993) (citing 2 Wayne R. LeFave & Jerold H. Israel, Criminal Procedure § 11.6 (1984)). Equating by analogy the vicinage requirement of the Sixth Amendment to the fundamental right to trial by jury, defendants argue their convictions must be reversed because the record does not demonstrate that the waivers were "knowing, intelligent, and voluntary at the time [they were] accepted by the district court." United States v. Robertson, 45 F.3d 1423, 1433 (10th Cir. 1995) (holding that trial by jury is a fundamental right that can only be waived by defendant in person).

This analogy is misplaced. The issue here is not the deprivation of trial by jury, but the question of what constitutes a valid waiver to defective jury composition. When a defense attorney decides for reasoned strategic purposes not to make a constitutional or statutory objection to the composition of a petit jury, the defendant is bound even if the

15

attorney fails to consult him or her about the choice. See United States v. Stewart, 700 F.2d 702, 704-05 (11th Cir. 1983); Winters v. Cook, 489 F.2d 174, 176 (5th Cir. 1973) (en banc); see also United States v. Spiegel, 604 F.2d 961, 965 n.9 (5th Cir. 1979) ("Only where there is evidence of fraud or gross incompetence by an attorney—which is not at issue here—or where an 'inherently personal right of fundamental importance is involved,' does the law require defendant to personally waive his or her rights." (quoting Winters, 489 F.2d at 178)).

As soon as the vicinage defect was discovered, the court brought the problem to the attention of trial counsel. Asked to consider the possibility of waiver, Evans's counsel announced that the decision would have to be made on "tactical" grounds. 14 R. at 1799. Having ascertained the identity of the alien juror, Evans's counsel stated: "[T]he alternate doesn't appear to have been taking notes and because of all of the inconsistencies in the testimony of the government's witnesses, the ones who took notes will be better for us to argue to, so we will waive." Id. at 1802. Durham's attorney waived immediately thereafter. See id. We have no doubt that counsels' decision to waive was made for sound reasons of trial strategy.

Although the better practice would be for the court to inform the defendant personally on the record of the nature of the right and the consequences of a waiver, an attorney need not consult with his client on every possible decision that has constitutional implications. See Estelle v. Williams, 425 U.S. 501, 508 n.3 (1976) (noting that, although

16

the courts require that the defendant make a knowing decision to forgo the fundamental right to the assistance of counsel, the Court does not engage "in this exacting analysis with respect to strategic and tactical decisions, even those with constitutional implications, by a counseled accused"). Here, trial counsel for both defendants made a considered, tactical decision to enhance the potential for acquittal. That decision served as a proper waiver of the defendants' constitutional and statutory rights to a jury comprised of citizens from the district in which the crime occurred.

**VI**

Evans claims he was prejudiced by the trial court's refusal to sever his trial from Durham's after the government charged Durham with four counts of perjury. Keeping in mind that there is a "preference in the federal system for joint trials of defendants who are indicted together," see Zafiro v. United States, 506 U.S. 534, 537 (1993), we review a district court's decision to grant or deny a severance for abuse of discretion, and we will not reverse absent an affirmative showing of prejudice. See United States v. Rodriguez-Aguirre, 108 F.3d 1228, 1233 (10th Cir.), cert. denied, 118 S. Ct. 132 (1997).

We perceive no abuse of discretion. Evans advances nothing more than conclusory allegations concerning the existence of prejudice. Substantially the same evidence that was used to demonstrate the falsity of the statements made by Durham was used to demonstrate that Evans was part of the conspiracy. See United States v. Shorter, 54 F.3d 1248, 1258 (7th Cir. 1995) ("Perjury counts may be tried with other offenses, . . .

17

especially if the perjury relates to the conduct underlying the other charges."). And, to the limited extent that the charges against Durham involved evidence that would not have been admitted against Evans had he been tried alone, Evans can do no more than speculate that the jury may have inferred his guilt from that evidence. Such conclusory "spillover" claims alone do not warrant severance so long as there is sufficient evidence in the record to convict without the "alleged perjury implication." Id. at 1259.

**VII**

Evans also claims that the district court unconstitutionally refused to permit him to inquire into Montgomery's prior misdemeanor convictions for assault and battery in an effort to show how much prison time Montgomery was avoiding through his plea agreement. "'[T]he exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 316-17 (1974)). The Confrontation Clause, however, does not prohibit the district court from imposing some limits on defense counsel's inquiry into the potential bias of a prosecution witness. Id. at 679. "'[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Id. (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)).

Thus, a district court may impose "reasonable limits on such cross-examination

18

based on . . . interrogation that is repetitive or only marginally relevant." Id. In this case, the defense was permitted to question Montgomery in the following areas: (1) his motivation to achieve a reduced sentence for the crimes to which he had pled guilty by cooperating with the government, see 10 R. at 911, 1052; (2) his fear of imprisonment, see 10 R. at 915; (3) whether he had taken a lie detector test, see 10 R. at 1044; (4) documentary evidence that conflicted with Montgomery's testimony, see 928-29; (5) prior drug use and drug dealing, see 10 R. at 931-63, 977, 1036; (6) the terms of his plea agreement, see 10 R. at 989; (7) the profits he retained from his drug dealing, see 10 R. at 990; (8) his prior acts of bribery and attempted bribery, see 10 R. at 995-96, 1006; and (9) his general propensity to lie and use others in order to avoid trouble with the authorities, see 10 R. at 992, 1050, 1083, 1109. On the record before us, we conclude that the limits were reasonable and gave adequate opportunity to conduct an effective cross-examination. See Van Arsdall, 475 U.S. at 679.

## VIII

Evans was charged with using and carrying a firearm, during and in relation to the charged drug conspiracy, in violation of 18 U.S.C. § 924(c)(1). He argues that his § 924(c) conviction must be reversed because the court's instruction on "use" of a firearm was erroneous in light of the Supreme Court's decision in Bailey v. United States, 116 S. Ct. 501 (1995). We agree that the instructions were erroneous but find that such error does not require reversal of the jury's verdict in this case.

19

To prove use under <u>Bailey</u>, the government must show that the "firearm [was] an operative factor in relation to the predicate offense." <u>See id.</u> at 505. Mere proximity and accessibility of the weapon to the defendant is insufficient to establish use. <u>See id.</u> Here, the district court instructed the jury that "[t]he phrase uses or carries a firearm means having a firearm available to assist or aid in the commission of the crime charged." 15 R. at 1977. Both sides therefore agree that the instructions do not comport with <u>Bailey</u>'s definition of use as "active employment." <u>See Bailey</u>, 116 S. Ct. at 506. Moreover, the government correctly concedes that the evidence is insufficient to support a conviction on the basis of "use." Evans's semi-automatic pistol was found in between the driver's and passenger's seats of the truck Evans was driving when he was stopped for speeding. Despite the weapon's proximity to both the drug proceeds in the vehicle and to Evans himself, there is no indication that the weapon was actively employed in relation to the drug conspiracy charged.

Nevertheless, "an erroneous 'use' instruction does not require reversal of the conviction when the jury was also instructed without objection on 'carry,' the defendant did not dispute that the firearm was carried on his person or in his vehicle, and the jury verdict necessarily includes an inherent finding of 'carrying during and in relation to the drug crime.'" <u>United States v. Holland</u>, 116 F.3d 1353, 1359 n.4 (10th Cir.), <u>cert. denied</u>, 118 S. Ct. 253 (1997). We affirm if "convinced that it was impossible upon the evidence and instructions for the jury to have returned a 'use' conviction without finding all the

20

elements of a 'carrying' violation as well." See id.; see also California v. Roy, 117 S. Ct. 337, 339 (1996) (Scalia, J., concurring) ("The error . . . can be harmless only if the jury verdict on other points effectively embraces this [element] or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well."). In this case, the jury was instructed without objection on the carry element and Evans does not dispute the presence of the firearm in his vehicle. Thus, the only issue before us is whether the jury's verdict necessarily incorporates all of the requisite findings to support a conviction under the "carry" prong of § 924(c).

Evans contends that the jury's verdict could not necessarily include the requisite findings because the district court administered an erroneous "carry" instruction when it failed to instruct the jury that it had to find that Evans had "transported" the weapon. See United States v. Spring, 80 F.3d 1450, 1465 (10th Cir.), cert. denied, 117 S. Ct. 385 (1996). We agree that the instruction was incomplete and, therefore, erroneous. See id. Under Holland, however, we look at the "instructions given and the nature of the evidence" to determine whether the jury's verdict is the "functional equivalent" of finding a "carry" violation. See 116 F.3d at 1359 n.4. Thus, the failure to administer a complete instruction with respect to the "carry" prong of § 924(c) does not mandate reversal if the jury's verdict "necessarily embraced all of the elements of a 'carrying' violation." See id.

The "carry" prong involves two elements: "possession of the weapon through the exercise of dominion or control; and transportation of the weapon." See United States v.

21

Spring, 80 F.3d 1450, 1465 (10th Cir.) (quoting United States v. Martinez, 912 F.2d 419, 420 (10th Cir. 1990)), cert. denied, 117 S. Ct. 385 (1996). Here, without distinguishing between "use" and "carry," the district court instructed the jury that it could convict under § 924(c) only if the government "prove[d] beyond a reasonable doubt a firearm was in a defendant's possession or under the defendant's control during and in relation to the commission of the drug trafficking crime." 15 R. at 1977. Thus, Evans's possession of the weapon during and in relation to the predicate offense was necessarily included in the jury's verdict. The question then becomes: could the jury have found that Evans was in possession of the firearm at the time of the traffic stop without also finding that he had transported it to that point? The answer is no.

The only firearm the jury considered was the nine millimeter semi-automatic found between the driver's and passenger's seats of the pickup truck being driven by Evans at the time of the traffic stop on June 21, 1994. At that time, Evans told the arresting officer that he had a gun in the truck; no other firearms were found during a subsequent search of the vehicle. We can see no way for the jury to have found that Evans was in possession of the firearm at the time of the stop without also finding that Evans had transported the firearm to that location in the first place. See United States v. Richardson, 86 F.3d 1537, 1548 (10th Cir.) (affirming conviction under "carry" prong in part because one firearm was found "in the truck on the seat next to [the defendant]"), cert. denied, 117 S. Ct. 588 (1996); United States v. Miller, 84 F.3d 1244, 1259 (10th Cir.) (to convict under "carry"

22

prong, "the government is required to prove only that the defendant transported a firearm in a vehicle and that he had actual or constructive possession of the firearm while doing so."), cert. denied, 117 S. Ct. 443 (1996). Based on the evidence and the jury instructions in this case, the jury's finding that Evans was in possession of the firearm necessarily "embraces" the finding that Evans had transported the weapon. Roy, 117 S. Ct. at 339-40. The jury's verdict therefore incorporated all of the findings necessary to convict under the "carry" prong of § 924(c)(1).

## IX

The sentencing court found that Durham's role in the conspiracy was that of a low-paid broker and, as such, he was less culpable than the "average participant." 17 R. at 2181. Consequently, the court found that Durham's role fell between that of a minor and a minimal participant under § 3B1.2 of the Sentencing Guidelines. His offense level was therefore decreased by three. See U.S.S.G. § 3B1.2. The government argues this adjustment was in error.

"'A trial court's findings concerning a defendant's role in a particular offense are treated by an appellate court as factual findings, which are subject to deferential review under the clearly erroneous standard.'" United States v. Santistevan, 39 F.3d 250, 253 (10th Cir. 1994) (quoting United States v. Chavez-Palacios, 30 F.3d 1290, 1295 (10th Cir. 1994)). It is undisputed that Montgomery was the leader of the drug distribution organization that is the subject of this case and that Evans was his partner. Durham's role

23

was limited to facilitating sales; proceeds from those sales went predominantly to conspirators other than Durham. Furthermore, Durham had no dealings with Evans or Montgomery for over two years prior to Montgomery contacting him pursuant to his agreement with the government. On the record before us, we conclude the sentencing court made no clear error.

AFFIRMED.